**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **JORGE PONSA-RABELL, CARINA PEREZ-CISNEROS ARMENTEROS** | **Civil No. 17-2243** |
| **Plaintiffs,** | **SECURITIES CLASS ACTION** |
| **vs.** | **JURY TRIAL DEMANDED** |
| **SANTANDER SECURITIES, L.L.C.** | |
| **Defendant** | |

**INDEX**

| **SECTION** | | **PAGE** |
|---|---|---|
| I. | **INTRODUCTION** | 1 |
| II. | **JURISDICTION AND VENUE** | 3 |
| III. | **THE CLAIMS OF THIS ACTION ARE NOT SUBJECT TO ARBITRATION** | 6 |
| IV. | **PARTIES** | 6 |
| V. | **COMMON FACTUAL ALLEGATIONS** | 8 |
| | A. **The PRMBs and Their Poor Creditworthiness During the Class Period** | 8 |
| | B. **The Events or Circumstances in The PR Economy That Lead to Changed Increased Risks in The Market of The PRMBs** | 11 |
| | C. **The PRCEFs and Their Poor Creditworthiness During the Class Period** | 15 |
| | D. **The Substantial Decrease in Value of The PRMBs And CEFs Was Clearly Foreseeable to SSLLC And It Was Only a Matter of Time** | 17 |
| | E. **SSLLC's concern about the risk caused by owning any PRMBs (and thereby and PRCEFs) during the Class Period** | 18 |
| | F. **During the Class Period SSLLC solicited the Plaintiffs and other Class members to purchase over $281 million worth of PR securities** | 19 |
| | G. **The Scheme to Defraud Through Omissions of Material Facts** | 20 |
| | H. **The Materiality of the Omitted Facts** | 21 |
| | I. **Loss Causation/Economic Loss** | 22 |
| | J. **SSLLC Acted With Scienter** | 23 |
| VI. | **CLASS ACTION ALLEGATIONS** | 23 |

|       | A. Class Action Type | 23 |
|       | B. Class Definition | 24 |
|       | C. Rule 23(a) Numerosity | 24 |
|       | D. Rule 23(a) Commonality Of Facts And Law | 25 |
|       | E. Rule 23(a) Typicality | 26 |
|       | F. Rule 23(a) Adequacy Of Representation | 27 |
|       | G. Rule 23(b)(3) | 28 |
| VII.  | FRAUDULENT CONCEALMENT EQUITABLE TOLLING | 28 |
| VIII. | CAUSES OF ACTION | 29 |
|       | A. First Claim for Relief – Federal Securities' Act Violations | 29 |
|       | B. Second Claim - Fault, Fraud, Deceit, Recklessness and Negligence | 32 |
|       | C. Third Claim - Demand for Attorney's Fees, Expenses and Interests | 34 |
| IX.   | JURY DEMAND | 36 |
| X.    | PRAYER FOR RELIEF | 36 |

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **JORGE PONSA-RABELL, CARINA PEREZ-CISNEROS ARMENTEROS** | **Civil No. 17-2243** |
| **Plaintiffs,** | **SECURITIES CLASS ACTION** |
| **vs.** | **JURY TRIAL DEMANDED** |
| **SANTANDER SECURITIES, L.L.C.** | |
| **Defendant** | |

### CLASS ACTION COMPLAINT

Plaintiffs bring this case, individually, and on behalf of all others similarly situated, against Defendant Santander Securities, L.L.C., by Plaintiffs' undersigned attorneys, for Plaintiffs' Complaint against Defendant, and allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the findings of facts made by the Financial Regulatory Authority (FINRA) in a Letter of Acceptance, Waiver and Consent (AWC Letter) of October 13, 2015, security research reports, media reports, and other information.

### I.    INTRODUCTION

1.     During the period from **December 2012 through October 2013** (the "Class Period"), Santander Securities, L.L.C. (SSLLC) solicited the Plaintiffs and other putative Class members ("Class Members") to purchase over **$180 million** worth of Puerto Rico Municipal Bonds (PRMBs) and **$101 million** worth of Puerto Rico Closed End Funds (PRCEFs or CEFs) (collectively "PR securities").

2.    In connection with those solicited purchases or sales, acting with scienter and with the intent to execute the transactions, SSLLC devised as scheme to defraud by which it either instructed its FAs to omit material facts to the purchaser Plaintiffs and putative Class members, or concealed the material facts from its FAs to prevent their disclosure to the purchaser Plaintiffs and putative Class members ("Scheme to Defraud").

3.    In particular, during the Class Period, SSLLC omitted and concealed material facts from the Plaintiffs and putative Class members, among other, about changes in the PR economy and the market of PR securities that made the securities too risky, and that because of those risks it was selling all its inventory of PRMB.

4.    SSLLC had a duty to inform and disclose those facts because they were material to the purchase of the PR securities by the Plaintiffs and putative Class members.

5.    Those material facts were not informed to the Plaintiffs and putative Class members at the point of sale following SSLLC's explicit higher management decisions, and/or instructions.

6.    The information about the risks that the PRMBs entailed was also highly relevant to the purchases of the CEFs because they are heavily concentrated (over 67%) and leveraged (doubling the concentration to over 134%) in PRMBs.

7.    The omitted and concealed facts were material because they are of a kind that the Plaintiffs, putative Class members, and any reasonable person would want to know, and would consider to be important when deciding to purchase the PR securities.

8.    The materiality of the facts omitted and concealed from the Plaintiffs and putative Class members in connection to their purchase of the PR securities create a presumption of reliance.

2

9.      The materiality of the omitted and concealed facts from the Plaintiffs and putative Class members in connection to their purchase of the PR securities made the purchase transactions fraudulent because the disclosure of the omitted facts would influence them and any reasonable person not to purchase the securities. That is, had the Plaintiffs and putative Class members been informed by SSLLC about those omitted and concealed material facts they would have not purchased the PR securities.

10.     As a direct result of the foregoing material omissions by SSLLC, the Plaintiffs and putative Class members sustained severe economic losses.

11.     The Plaintiffs and putative Class members would have not sustained those economic losses had not been because of the foregoing material omissions and concealments by SSLLC in connection with their purchase of the PR securities.

12.     The Plaintiffs bring this case, individually, and on behalf of all others similarly situated, under the federal securities laws, and the laws of the Commonwealth of Puerto Rico, requesting adequate monetary compensation against SSLLC for their economic losses and/or requesting the Court to declare null and void, *ab initio*, and the rescission, of the purchase transactions of the PR securities, plus reasonable attorneys' fees, prejudgment interests, costs, and post judgment interest.

## II.      JURISDICTION AND VENUE

13.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and §27 of the Exchange Act, 15 USCS § 78aa[1].

---

[1] (a) In general. The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this title [15 USCS §§ 78a et seq.] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title [15 USCS §§ 78a et seq.] or the rules and regulations thereunder.

3

14.     In connection with the acts alleged in this Complaint, SSLLC, directly or indirectly, used, among other, the means and instrumentalities of interstate commerce, including, but not limited to the mails, interstate telephone and electronic communications.

15.     Plaintiffs' federal claims arise under: Sections 10(b), 15 USCS § 78j,[2] and Exchange Act Rule 10b-5, 17 CFR 240.10b-5,[3] that prohibit fraudulent conduct in connection with the purchase or sale of securities; and 15 USCS § 78cc(b) & (c)[4] that makes the purchases voidable.

16.     This Court has supplemental jurisdiction over all the other PR law claims and SSLLC pursuant to 28 USC §1367 because they are so related to claims in the action within such

---

[2] It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[3] It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

[4] (b) … Every contract made in violation of any provisions of this title [15 USCS §§ 78a et seq.] or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title [15 USCS §§ 78a et seq.] or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract,

original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

17.     SSLLC's duties of care towards the Plaintiffs and Class members stem from the Account and Financial Advisor Agreement; the fiduciary and suitability duties imposed by Securities Exchange Act; FINRA Rule 2111 and Guidelines; the applicable industry standards and regulations; the fiduciary duty imposed by PR Regulation 6078, Section 25.1; and, the general duties of care and good faith established by the Civil Code, 31 L.P.R.A. §§ 3021[5] & 3375,[6] and **that are actionable under the federal securities laws,[7] and the PR statutory law**. 31 L.P.R.A. §§ 5141, 3018 and 3020.

18.     In particular, Puerto Rico has adopted by law and regulation that "[e]very broker-dealer … must observe the highest standards of fiduciary duty toward their customers and investors." OCFI Regulation 6078, § 25.1.

19.     The Plaintiffs raise claims against SSLLC under the Laws of Puerto Rico for: fault, fraud, deceit, recklessness and negligence in the fulfillment of contractual, suitability and fiduciary obligations, 31 L.P.R.A. § 3018; costs, attorney's fees, interest and expenses, 32 L.P.R.A. Ap. III R. 44.1.

---

[5] "The fault or negligence of the debtor consists in the omission of the steps which may be required by the character of the obligation and which may pertain to the circumstances of the persons, time, and place. Should the obligation not state what conduct is to be observed in its fulfillment, that observed by a good father of a family shall be required." 31 L.P.R.A. § 3021.

[6] "Contracts are perfected by mere consent, and from that time they are binding, not only with regard to the fulfillment of what has been expressly stipulated, but also with regard to all the consequences which, according to their character, are in accordance with good faith, use, and law." 31 L.P.R.A. § 3375.

[7] The federal securities laws adopt these fiduciary duties that apply under the Commonwealth Law. *Colon v. Diaz-Gonzalez*, 2009 U.S. Dist. LEXIS 12780, 23-24 (D.P.R. Feb. 19, 2009), n. 4.

### III.    THE CLAIMS OF THIS ACTION ARE NOT SUBJECT TO ARBITRATION

20.    The Plaintiffs and other similarly situated putative Class members' agreements with SSLLC contain an arbitration clause where the parties agreed to arbitrate all claims among themselves related to the securities contract and services.

21.    SSLLC is a member of FINRA, *infra.* FINRA R 12204 (d) provides that,

> "A member or associated person may not enforce any arbitration agreement against a member of a certified or putative Class action with respect to any claim that is the subject of the certified or putative Class action until:
> • The Class certification is denied;
> • The Class is decertified;
> • The member of the certified or putative Class is excluded from the Class by the court; or
> • The member of the certified or putative Class elects not to participate in the Class or withdraws from the Class according to conditions set by the court, if any."

22.    In view of the foregoing, SSLLC is barred from enforcing the arbitration agreement against the Plaintiffs and putative Class members until one of the above listed circumstances occur.

### IV.    PARTIES

23.    The Plaintiffs are: Jorge Ponsa-Rabell, and Carina Perez-Cisneros Armenteros.

24.    The Plaintiff Jorge Ponsa-Rabell (Mr. Ponsa) is of legal age, a businessman, domiciled and resident of Puerto Rico.

25.    The address for the Plaintiff Mr. Ponsa is: PO Box 364423, San Juan PR 00935-4423.

26.    At the times, relevant herein Mr. Ponsa had with SSLLC the investment account xxx-xx4692.

27.    During the Class Period, Mr. Ponsa purchased from SSLLC, the following PR securities: 95,000 shares of PUERTO RICO SALES TAX FING CORP SALES TAX REV TAXABLE SUB-SER D at $101 per share, for a cost $95,950.

28.     The Plaintiff Carina Perez-Cisneros Armenteros (Ms. Perez) is of legal age, a dental resident at the University of Puerto Rico, Medical Sciences Campus, domiciled and resident of San Juan, Puerto Rico.

29.     The address for the Plaintiff Ms. Perez is Urb. Venus Gardens Norte, Calle Saltillo 732, San Juan 00926.

30.     At the times, relevant herein the Ms. Pérez had with SSLLC the investment account xxx-xx4231.

31.     During the Class Period, Ms. Pérez purchased from SSLLC, the following PR securities: 18,000 shares of PUERTOR RICO COMMWLTH GOVT DEV BK RFDG SR NTS-SER A at $100.005 per share, for a cost of $18,000.83.

32.     The Defendant is: Santander Securities, LLC ("SSLLC").

33.     SSLLC is a registered broker/dealer, FINRA Member CRD# 41791 and a Registered Investment Advisor with Main Office location at Santander Tower B7 Tabonuco Street, Suite 1800, Guaynabo, PR 00968-3028 with mailing address at 75 State Street, Mail Code MA1 SST 04-06, Boston, MA 02109 and tel. #787-759-5330.

34.     SSLLC is a subsidiary of Santander BanCorp. Santander BanCorp is part of Santander Holdings USA, Inc. (SHUSA) and is a company offering integrated financial services in Puerto Rico. SHUSA is a wholly owned subsidiary of Banco Santander S.A. with corporate Headquarters at CGS Av. Cantabria s/n 28660 Boadilla del Monte, Madrid (Spain) (Banco Santander S.A. and its subsidiaries SHUSA, Santander BanCorp and SSLLC are hereinafter jointly referred to as "Santander").

35.     SSLLC is a securities and money management firm that provides Broker Dealer, financial consultant services and investment products. SSLLC is the dominant market trader of PRMB and market maker and trader in shares of the First Puerto Rico Funds (PRCEFs).

## V.     COMMON FACTUAL ALLEGATIONS

### A.  The PRMBs and Their Poor Creditworthiness During the Class Period

36.     The PRMBs are financial instruments of debt used by the Government of Puerto Rico, its agencies and Public Corporations to finance their commercial operations. These securities have a maturity date where the buyer should receive the return of the money borrowed and they pay a fixed monthly yield or interest. The issuers guarantee the payment of the monthly yield and of the principal at maturity. As to some Government Obligation Bonds ("GOBs") the Constitution of Puerto Rico guarantees these payments.

37.     Throughout the years, Santander, its affiliates and subsidiary SSLLC, have been actively involved in the underwriting, marketing, and sale of PRMCBs, and in the creation and management of its proprietary PRCEFs, that purchased a great part of the PRMBs, and in the marketing and sale of the shares of its proprietary PRCEFs.

38.     Santander, its affiliates and subsidiary SSLLC, have earned enormous income from the foregoing commercial transactions that encouraged Puerto Rico to issue debt to unsustainable levels and that came to be unpayable.

39.     In the year 1996, José Ramón González was appointed to direct SSLLC. González had served as head of the Government Development Bank for Puerto Rico ("GDB") between 1986 and 1989, and had participated in the development of the municipal debt business in PR. The GDB is the PR public corporation that is responsible to choose the bank or banks that underwrite and sell the PRMBs.

40.     At SSLLC, González participated in the creation of the First Puerto Rico Family of funds and CEFs (PRCEFs), *infra,* that invested over 67% of their assets in the PRMBs.

41.     In 2002, González was named executive director of Santander BanCorp, Santander's holding company on the Island, where he remained until 2008. His replacement as executive director of SSLLC was Carlos M. García. Garcia had been González' pupil at SSLLC, when he entered in 1997 to orchestrate PRMBs issues.

42.     Under the direction of González and García, SSLLC took over the business of securing and subscribing PRMBs.

43.     In 2004, Santander helped to issue more than **$6.1 billion** of PRMBs.

44.     In 2005, Santander's revenue from management fees for PRMBs already accounted for half of its PR holding profits.

45.     The precarious debt situation of Puerto Rico was gradually getting worse for years. To understand the large losses in the PRMBs we must review why Puerto Rico has fallen into this debt crisis. Until the mid-two thousand, Puerto Rico tended to mimic the growth of the American nation.

46.     In 2006, Puerto Rican public debt began to skyrocket, from 63% of GDP to 100% in 2015. In May 2006, Puerto Rico entered a recession while the U.S. was still in full economic expansion. Since then, Puerto Rico has been in recession, battling huge deficits, and the government decided to pay its obligations by an ongoing continuous increase in its sales of PRMBs.

47.     During the first years, Santander participated in the issuance of **$32 billion** dollars in PRMBs, which reported benefits increased from **€ 51 million in 2004** to **€ 75 million and € 60 million in 2008 and 2009** respectively.

48.     In 2008, the revolving door between Santander and the PR public administration began to turn and has not stopped. Santander, which had been in the business of marketing and PRMBs issuance, began to exchange managers with the GDB.

49.     Carlos Garcia was appointed director of the GDB in 2008. García took with him to the GDB Jesus F. Méndez, former general manager of SSLLC; David Álvarez, an analyst at SSLLC; William Lockwood Benet, former consultant of Santander; George Joyner, former president of Santander Mortgage Corp.; and Fernando L. Batlle. Juan Carlos Batlle, the brother of Fernando, took over and replaced Méndez as general manager of SSLLC. This group of former Santander executives established at the GDB a PRMBs issuance program.

50.     In 2009, at GDB, Garcia sold **5.3 billion dollars** in Corporation of the Urgent Interest Rate Fund Bonds (COFINA) with two issues in which Santander participated as the main seller and insurer.

51.     Under the direction of Garcia and Batlle, **$10.8 billion** of COFINA's debt was issued. Much of it has maturities between 32 and 39 years, although the Constitution of Puerto Rico prohibits the issuance of debt with maturities over 30 years.

52.     The new management of the GDB by the ex-Santander employees also created and distributed PRMBs agreements that included capital appreciation bonds and swaps, which operate as floor clauses and force them to continue paying high interest rates even if they fall. Santander benefited from being an insurer and broker of these bonds, as Goldman Sachs did with the debt of Greece. For example, one of these operations paid **$730 million** for an issue of **$139 million**, due to high interest rates, capitalization of those interests and long terms.

53.     In 2011, Juan Batlle, until then Director of SSLLC, replaced García as director of the GDB while his brother Fernando left the GDB to become the chief executive of SSLLC. When

10

García left the GDB, he returned to Banco Santander, where he became executive vice president of SHUSA, the Santander banking holding company in the United States.

54.     In 2011, with Juan Batlle at the head the GDB, capital appreciation PRMBs, with maturity periods of 35 to 37 years and an interest rate of 7%, were issued that will cause the people of Puerto Rico to repay up to 13 times the amount borrowed. This issue was approved by Juan Batlle, at the GDB, granting a discount on the subscription of **$2.7 million** to Santander led at that time by his brother, Fernando, who led the sale of the PRMBs.

55.     From 2006 to 2013, Puerto Rico issued around **$61 billion** in PRMBs paying **$1.4 billion** in fees to securities firms and other entities among which Santander was always one of the main beneficiaries thanks to the preferential treatment that it received under the direction of Garcia in the GDB.

56.     The moneys obtained by Puerto Rico from the issuance of that **$61 billion** debt was used to pay off previous public debt and to finance the state deficit in an account-making operation very similar to that carried out by Greece to maintain its rating against foreign investors. That is, debt to pay debt, but never used to revive the Puerto Rican economy or alleviate its social needs.

**B.  The Events or Circumstances in The PR Economy That Lead to Changed Increased Risks in The Market of The PRMBs**

57.     The worrisome economic situation brewing for years in Puerto Rico and the size of its increasing unsurmountable debt made clearly foreseeable to SSLLC the likelihood of the upcoming degradations of the quality and creditworthiness of the PR Bonds, and in turn of the PRCEFs, which assets were highly invested and leveraged in these Bonds.

58.     Among other material facts that made the upcoming degradations foreseeable to SSLLC were: the outstanding debt of PR that had turned unsustainable, reaching around **$70 billion**; an increasing deficit up to around **$2.2 billion**; a pattern of the issuing new debt to balance

11

its budget and repay debt coming to be due; the shrinking economy; high unemployment rate, at relevant times in around 15.5%; high percentage of public sector employees, at relevant times in around 265,000, or around 30% of the total jobs; soaring cost of living; pervasive crime; poor and inefficient public services; and the exodus of professionals and middle-Class Puerto Ricans.

59.    As of 2012, SSLLC knew that there were well known and longstanding credit and solvency risks within the Puerto Rico market. In 2012, the signs of the decline of the PR economy and the risk of the investments in PR Securities became more evident, as indicated by the following red flags and "material facts" known by SSLLC about the risks of investing in the PR securities:

- On **January 11, 2012**, Wealth Management Research ("WMR") highlighted and discussed the following PR credit concerns: "the Commonwealth's reliance on regular access to the capital markets constitutes the most pronounced credit risk for investors"; "the persistent recession that has dogged the Commonwealth since 2006"; "A sluggish island economy adds further pressure and poses a risk to future budget projections"; "the overall fiscal and economic situation remains uncertain"; "we believe that Puerto Rico credits would be more adversely affected than more highly rated municipal government and essential service obligations"; Rising debt burden – "The amount of economic debt is seven times its annual general fund budget"; "Puerto Rico's debt ratios contrast unfavorably with the 50 US states"; significant. When we combine bonded debt and unfunded pension liability, the contrast is striking"; "Puerto Rico's pension liability remains a significant challenge.

- On **August 8, 2012**, Moody's lowered Puerto Rico's GO credit rating to Baa1 with a negative outlook. In its report, the ratings agency cited the "Commonwealth's unfunded pension liability as a principal concern." "Based on assumptions used in the latest actuarial valuation, the ERS (the largest of the three systems) would deplete its net assets by FY14 and its gross assets by FY19."; "The teachers plan would deplete its net and gross assets by FY20 and the judiciary plan would do so by FY18."; The depletion of assets available to cover pension benefits is ultimately the responsibility of participating employers in the plans. A diverse group of public entities contribute to the ERS but the Commonwealth is the primary employer, responsible for 74% of the combined annual funding deficiency. The balance of the liability is the responsibility of municipalities and participating public corporations."

  The research opined that "current spreads for many Commonwealth borrowers do not fully reflect the unresolved credit issues and we expect more downside than upside momentum to the credit for now."; "the Commonwealth's GO debt is likely

to come under further rating pressure over the next three years."; Conservative investors with concentrated exposure to any single borrower in the municipal market should pursue portfolio diversification".

- On **March 2012**, Breckinridge Capital Advisors, issued a Special Commentary - Puerto Rico's Challenge, where it con concluded "the Commonwealth today is flirting with insolvency, and the risk is growing that someday, Commonwealth investors may not be repaid, in full. Puerto Rico's financial condition is far worse than any U.S. states, and a default – though unlikely in the immediate future – is a possibility over the next few years."; "the possibility of a default by Puerto Rico is sufficient to warrant the attention of municipal investors."

- On **May 24, 2012**, Wells Fargo Securities, Economics Group – Special Commentary "the future of the Puerto Rican economy does not look too promising… how many years can an economy that does not grow, or even worse, that continues to shrink, continue to keep these levels of expenditures without collapsing? If the economy continues on this path then it will be difficult to keep the payments going, especially once the temporary tax on 'foreign corporations' is completely phased off."

- On **July 27, 2012**, the Company Janney Capital Markets released its report "Puerto Rico's Debt Overload" that informed that: although new Bond issuers, such as COFINA and Employment Retirement System (ERS) Pension Obligation Bonds (POBs), have dedicated revenue streams, their creditworthiness is inextricably intertwined with the fiscal health of the Commonwealth; PR Debt growth magnitude "is unsustainable"; and that warned broker dealers that "[c]oncentrations in Puerto Rico paper exceeding 10% of a portfolio should be avoided, and investors on the lower end of the risk tolerance scale are advised to target lower concentrations".

- On **November 14, 2012,** a WMR, Special Report, entitled Voters Send Mixed Messages, recommended "that investors exercise caution in the near term with regard to investment in Puerto Rico bonds as the rating agencies are in the process of actively reviewing the credit following the recent election"; "Puerto Rico is struggling with a structural budget deficit, anemic economic growth, and an exceptionally low pension funding ratio. Investors are expressing increasing concern, as are the rating agencies."; "If S&P were to reduce the rating on the GO bonds, they may also choose to reduce the rating on other agency debt below investment grade. Such an action would raise the Commonwealth's cost of capital substantially and imperil future access to the market."

- **November 29, 2012**, a U.S. Trust, Municipal Research, Special Report, entitled Puerto Rico Credit Concerns. The conclusion stated:

   "**In our opinion, Puerto Rico's credit should be viewed as below investment grade**, based on our analysis of its economy, finances, debt and pensions.

Accordingly, we do not recommend holding Puerto Rico bonds in separately managed accounts (other than bonds that are pre-refunded or escrowed-to-maturity), and we would be cautious in selecting single-state municipal bond mutual funds that contain significant holdings in Puerto Rico-backed paper." *Emphasis supplied.*

- **On December 12, 2012**, multiple articles predicted the Detroit Bankruptcy that later took place in 2013.

- **On December 13, 2012**, Moody's downgraded GOs from Baa1 to Baa3, which was just a step before GOs came to be considered "junk" or not investment grade. GO's negative outlook was also announced. Moody's explained that the reason for the degradation was the long and incurable PR recession and PR's high and unsustainable level of debt.

- **On December 19, 2012**, a Popular Securities LLC (PSL) presentation, entitled Puerto Rico Credits: A Closer Look, informed that "[o]ver the course of 2012, investors have grown increasingly cautious with regard to Puerto Rico's credit".

The presentation listed a number of major investors and analysts have released research and commentary that had been critical of Puerto Rico's ongoing challenges and trading levels. The presentation further elaborated upon:

- Investor Concerns Regarding Puerto Rico Debt because of: Weak Economy; Underfunded Pensions; Debt Burden – stating that "Debt per capital and debt as a percentage of personal income continue to grow at an **unsustainable rate**"; and liquidity concerns. *(Emphasis supplied)*.

- Rating Agencies' Concern Response to Election Result.

- Moody's Report of December 13, 2012 - Two-notch Downgrade, Negative Outlook.

- Overview of Commonwealth Credit Ratings were the vast majority of the agencies were 1 or 2 notches above "junk", with negative outlook.

- PR Central Government credit concerns:

  - an ongoing General Fund deficit,

  - government-wide debt increasing significantly faster than economic growth and government revenues,

  - the growing unfunded pension and non-pension benefit and obligations funding shortfalls of the three government retirement systems, PR

funding rations being the lowest (ERS 7%) x 6.45, when compared to the lowest stateside (IL 45%),

- In the **year 2012**, the size of the PR Debt was 76% of GDP.

- A **Feb. 2013**, PSL - PR Credit Update, the "Puerto Rico's economy continue[d] to struggle with the lingering effects of a recession, high unemployment, a weakened manufacturing sector, and a significant debt burden."

- "[I]n **July 2012** multiple articles discussed the precarious nature of the Puerto Rico debt market, including a research report warning of customer overconcentration in the sector and a news report noting an 'elevated risk' in the sector. In **December 2012** and **March 2013**, rating agencies cut Puerto Rico general obligation debt ratings to 'near junk' status, noted 'very high and growing government debt relative to the size or the economy,' and described the outlook as 'negative.'" (*Emphasis supplied*), factual findings, FINRA Letter of Acceptance, Waiver and Consent ("AWC"), 2013039142101.

### C.  The PRCEFs and Their Poor Creditworthiness During the Class Period

60.     The PRCEFs are investment funds created by corporations organized under the laws of Puerto Rico, with the approval of the Office of the Commissioner of Financial Institutions of Puerto Rico ("OCIF") that require that 67% of the Funds' assets are invested in PRMBs. The Funds are considered a pass-through entity that is supposed to distribute about 90% of their income to be considered as tax-free dividends. Because of these requirements, the PRCEFs invest at least 67% of their capital in PRMBs and the other 33% mostly in municipal bonds of U.S. agencies fixed-rate long-term maturities. The PRCEFs invest their capital in PRMBs that produce exempt interest income, and dividends paid to shareholders of the PRCEFs are represented as tax exempt to residents of Puerto Rico. The basis for the exemption seems to be a no-action letter. By their nature and investment requirements, the PRCEFs are very similar to each other on the ground that they invest their capital in similar values and that they all have very similar investment portfolios.

61.     According to the prospectus of the PRCEFs' their investment objective is to provide investors "current income consistent with preservation of capital".

62.     The PRCEFs sell shares of their stock and pay dividends product of their profits to their investors after deducting the costs of administration and management. The shares of the PRCEFs are not PRMBs notes but stocks issued by the Funds.

63.     The PRCEFs can borrow one dollar for every dollar of capital. Using leverage, the Funds can hold twice the amount of assets as the amount of equity. Interest rates are significant to the Funds because they mainly use short-term financing and the difference between the return on assets and the cost of funding is the number of dividends the Funds can pay.

64.     PRCEFs leverage their respective investment portfolios by financing approximately one half of their total assets. Said leverage permits the PRCEFs to purchase and hold securities with an aggregate market value equivalent to approximately two hundred per cent (200%) of their aggregate net worth, with the concomitant risk. For every dollar invested, a Fund can buy two dollars of securities with the second dollar of purchases financed with borrowed funds.

65.     The highly-leveraged structure of the PRCEFs significantly increased the risk of massive losses for the investors. Because the Funds had an approximately 50% leverage ratio, a 20% decline in the value of the PRCEFs' assets would cause the Funds, and, thus, the investors to suffer a 40% loss. As a result, the PRCEFs are structurally predisposed and was clearly foreseeable that they could cause enormous losses in the investors' portfolios that were over concentrated in them, and more so if they had used leverage, in the event of interest rates declines or credit downgrades such as those that took place.

66.     During the Class Period SSLLC was the distributor for the following proprietary PRCEFs:

   a.   First Puerto Rico Tax Exempt Fund;

   b.   First Puerto Rico Tax Exempt Fund II;

    c.   First Puerto Rico Tax Exempt Target Maturity Exempt Fund II;

    d.   First Puerto Rico Tax Exempt Target Maturity Exempt Fund III;

    e.   First Puerto Rico Tax Exempt Target Maturity Exempt Fund IV;

    f.   First Puerto Rico Tax Exempt Target Maturity Exempt Fund V;

    g.   First Puerto Rico Tax Exempt Target Maturity Exempt Fund VII;

    h.   First Puerto Rico Tax Advantaged Target Maturity Fund I;

    i.   First Puerto Rico Tax Advantaged Target Maturity Fund II;

    j.   First Puerto Rico Target Maturity Income Opportunities Fund I;

    k.   First Puerto Rico Target Maturity Income Opportunities Fund II;

    l.   First Puerto Rico AAA Target Maturity Fund I;

    m.   First Puerto Rico AAA Target Maturity Fund II; and,

    n.   First Puerto Rico Equity Opportunities Fund.

67.    As the result of the leverage, **the PRCEFs had a geographical concentration of at least 134% of their capital in PRMBs that, as of the year 2012, the vast majority were, for all relevant purposes, equal to high yield, or Junk Bonds**.

68.    By December 2012, the high leverage used by the PRCEFs to purchase PRMBs, by itself, and more so when it is combined with their overconcentration in the same or similar PRMBs, made the PRCEFs a **very high-risk and speculative investment**.

### D.  The Substantial Decrease in Value of The PRMBs And CEFs Was Clearly Foreseeable to SSLLC And It Was Only a Matter of Time

69.    During the Class Period, it was clearly foreseeable to SSLLLC that, because of the material facts and circumstances described in detail herein above, it was only a matter of time that the value of the PRCEFs and PRMBs was to adjust to their true lack of creditworthy and market demand and that a substantial decrease in their value was soon to occur. That is, there could be no

reasonable doubt in SSLLC's belief that the downfall was soon to occur, the only material question was when it was to occur. *See for example*, The Puerto Rico Municipal Bond Crisis - What Took You So Long? Jay Dulski, Gerry Guild, and Jack Duval.[8]

### E.  SSLLC's concern about the risk caused by owning any PRMBs (and thereby and PRCEFs) during the Class Period

70.     The following "material facts" show SSLLC's concern about the risk caused by owning any PRMBs (and thereby and PRCEFs) during the Class Period.

71.     During the Class Period, SSLLC acted to get rid of the risky PRMBs that it owned in inventory, and stopped any other purchases of PRMBs, to avoid the economic risk that they entailed.

72.     Starting in or around **November 29, 2012**, SSLLC began reducing its PRMBs inventory.

73.     On **December 13, 2012**, after Moody's downgraded the Puerto Rico's GOBs and related debt to Baa3, one step above junk-bond status, SSLLC accelerated its efforts to reduce its inventory of PRMBs, reflecting its greater concerns about changed increased risks in the market for PRMBs and its economic exposure to those risks.

74.     The next day, on **December 14, 2012**, SSLLC closed its Puerto Rico trading desk to any new purchases of PRMBs. As a result, SSLLC stopped purchasing PRMBs that its

---

[8] "A number of themes are self-evident regarding Puerto Rico: 1. The economic decline in Puerto Rico started in 2006, when the island economy suffered the one-two punch of a government shutdown and the expiration of a significant U.S. tax incentive; 2. The Puerto Rico economy has clearly been in a chronic long-term decline; 3. The combination of a long-term recession, dire macroeconomic factors, and ballooning debts made investing in Puerto Rico municipal bonds speculative in nature; 4. The use of leverage to purchase Puerto Rico bonds was extremely speculative and only suitable for those who understood the risks and could afford the loss of their entire investment; and 5. The only real surprise of the decline in bond prices was how long it took to materialize."

customers sought to sell. SSLLC did continue to process certain customer sell orders on an agency basis.

75.     Thereafter, SSLLC continued to reduce its inventory and market exposure and, by **October 2013**, shortly after when the market crash of the PR securities occurred, it had already eliminated entirely its inventory of PRMBs.

76.     SSLLC's liquidation of its PRMBs reflected its great concerns about changed increased risks in the market for the PRMBs and its exposure to those risks.

77.     The foregoing relevant findings of facts were made by FINRA, and are stated in the AWC No. 2014041355501. A copy of the AWC is attached as **Exhibit 1** hereto.

78.     The foregoing relevant facts show that during the Class Period, SSLLC liquidated and stopped the purchase of any PRMBs because of the high economic risk that they entailed.

79.     The foregoing relevant facts show that during the Class Period, SSLLC was able to sell all its inventory of PRMBs and avoid any substantial losses when the PR securities market crashed on or around the end of that Period.

**F.  During the Class Period SSLLC solicited the Plaintiffs and other Class members to purchase over $281 million worth of PR securities**

80.     During the Class Period, while on one hand SSLLC was getting rid of the PRMBs because of the high risk that they posed, on the other it solicited the Plaintiffs and other Class members to purchase over **$180 million** worth of PRMBs, and **$101 million** worth PRCEFs that were heavily concentrated and leveraged in those PRMBs, for a total of over **$281 million** in PR securities.

81.     During the Class Period, in response to SSLLC's solicitation, the Plaintiffs and putative Class members purchased over **$180 million** worth of PRMBs, and **$101 million** PRCEFs that were heavily concentrated and leveraged in those PRMBs.

82.     SSLLC's solicitation, to the Plaintiffs and putative Class members, for them to purchase during the Class Period over **$180 million** worth of the poor creditworthy PRMBs, and **$101 million** worth of PRCEFs was conflicted because of:

    a.  SSLLC's interest to sell the risky PR securities to reduce its economic risk and exposure.

    b.  SSLLC passed the risk of owning the PR securities to the Plaintiffs and other putative Class members.

    c.  SSLLC's economic interest in selling and maintaining a market for the risky PR securities.

**G. The Scheme to Defraud Through Omissions of Material Facts**

83.     During the Class Period, SSLLC devised a Scheme to Defraud by which it either instructed its FAs to omit the material facts to the purchaser Plaintiffs and putative Class members, or concealed the material facts from its FAs, to prevent their disclosure to the purchaser Plaintiffs and putative Class members, in connection with their purchase of the PR securities (the "Scheme to Defraud" or "Scheme").

84.     During the Class Period, SSLLC knowingly, willfully, and with scienter, an in furtherance of the Scheme, omitted and concealed, among other, the following material facts from the Plaintiffs and putative Class members in connection with their purchase of the PR securities ("material facts"):

    a.  The events or circumstances in the PR economy that lead to changed increased risks in the market of the PRMBs. *Supra.*

    b.  The nature of the economic risks exposure that the purchase of PRMBs created.

    c.  SSLLC's concern about the risk caused by owning any PRMBs (and thereby and PRCEFs) during the Class Period**.** *Supra.*

    d.  In particular, that starting in or around **November 29, 2012**, SSLLC began reducing its PRMBs inventory because of the foregoing risks.

e.  That on **December 13, 2012**, Moody's downgraded the Puerto Rico's General Obligation Bonds (GOBs) and related debt to Baa3, one step above junk-bond status.

f.  That the Moody's downgrade of the GOBs further increased SSLLC's concerns to the risk exposure of the PRMBs.

g.  That a result of the Moody's downgrade it accelerated its efforts to reduce its inventory of PRMBs.

h.  That it was liquidating its inventory of PRMBs because of its concerns about changed increased risks in their market and the economic risks exposure that they entailed.

i.  That, on **December 14, 2012**, SSLLC closed its Puerto Rico trading desk to any new purchases of PRMBs.

j.  That after **December 14, 2012** SSLLC stopped purchasing PRMBs that its customers sought to sell.

k.  That SSLLC's stop of purchase of PRMBs could reduce the liquidity of the PRMBs.

l.  That, after **December 14, 2012** SSLLC continued to liquidate its inventory of PRMBs to reduce its market exposure.

m.  The reasons why SSLLC was liquidating its PRMBs inventory.

n.  That the information about the risks that the PRMBs' entailed was also highly relevant to the purchases and sales of the PRCEFs because they are heavily concentrated (over 67%) and leveraged (doubling the concentration to over 134%) in PRMBs.

o.  Its conflicted interest in soliciting them to purchase the PR securities.

**H. The Materiality of the Omitted Facts**

85.  The above mentioned facts omitted and concealed by SSLLC in connection to the Plaintiffs and putative Class member purchase of the PR securities were material because:

a.  The omitted and concealed facts are of a kind that the Plaintiffs, putative Class member, and any reasonable person would want to know, and would consider to be important when deciding to purchase the PR securities.

    b.  The duties imposed by good faith, suitability and fiduciary standards mandated their disclosure to make the solicitation made, in the light of the circumstances, not misleading and fraudulent.

    c.  Had the facts been disclosed, the Plaintiffs and the putative Class members would have not purchased the PR securities.

    d.  They were influential and determinant in the Plaintiffs and putative Class members purchase of the PR securities.

## I.  Loss Causation/Economic Loss

86.    SSLLC failed to disclose material facts during the Class Period that operated as a fraud or deceit on the Plaintiffs and putative Class members in connection to their purchase of the PR securities.

87.    Had the Plaintiffs and putative Class members been informed by SSLLC about those material facts they would have not purchased the PR securities.

88.    As a direct result of the above mentioned omissions of material facts by SSLLC, the Plaintiffs and putative Class members purchased the PR securities and sustained severe economic losses. The named Plaintiffs have sustained trading losses as follows:

    a.  Mr. Ponsa has sustained trading losses of no less than **$72,437**.

    b.  Ms. Perez has sustained trading losses of no less than **$12,375**.

89.    The Plaintiffs and putative Class members would have not sustained those economic losses had not been because of the foregoing omissions and concealments of material facts by SSLLC in connection with the sale and purchase of the PR securities.

90.    The material facts that were omitted and concealed by SSLLC to the Plaintiffs and putative Class members were a proximate cause of the market crash of the PR securities and the economic losses sustained by them.

### J. SSLLC Acted With Scienter

91.    SSLLC had actual knowledge of the materiality of the facts that it omitted and concealed the Plaintiffs and putative Class members. SSLLC did so to deceive the Plaintiffs and putative Class members to purchase PR securities that otherwise they would not have purchased.

92.    Those material facts were not informed to the Plaintiffs and putative Class members at the point of sale following SSLLC's explicit higher management decisions and/or instructions in furtherance of the Scheme to Defraud them.

93.    SSLLC acted in the Scheme with conscious knowledge of the fraud and deception, scienter and "dolo",[9] and breached the good faith and fiduciary contractual duties that it owed to the Plaintiffs and putative Class members when in connection with the sale and purchase of the PR securities it willfully and knowingly omitted to state the material facts that were necessary in order to make the solicitations made, in light of the circumstances under which they were made, not misleading and fraudulent, and did so with the intent to deceive them to purchase the PR securities.

94.    As alleged herein, SSLLC violated the federal securities laws by, *inter alia,* knowingly omitting to disclose the above mentioned material facts to Plaintiffs and other Class members.

## VI.    CLASS ACTION ALLEGATIONS

### A. Class Action Type

95.    Plaintiffs bring this case as a Class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3).

---

[9] Under Puerto Rico contract law, "dolo" or "dolus" is an equivalent of scienter, fraud or deceit.

### B.  Class Definition

96.     The Plaintiffs seek that the Court certifies a Class defined as follows:

"All persons or entities that purchased Puerto Rico Municipal Bonds or Puerto Rico
Closed End Funds from Santander Securities, L.L.C. (SSLLC) during the period
covering from **December 2012 through October 2013** (Class Period).

Excluded from the Class are SSLLC, its employees, officers, directors, legal
representatives, and any parent, wholly or partly owned subsidiary, or affiliated
companies, or any entity in which any of the foregoing has, or had a controlling interest;
class counsel and their employees, the Judge, judicial officers and associated court
staff assigned to this case and their immediate family members; and any successors-
in-interest or assignees of any excluded party."

97.     Each named Plaintiff possesses the same interests and has suffered the same kind
of economic injury shared by all the members of the Class that the Plaintiffs seek to represent,
which claims for damages arise from the same operative facts and legal theories detailed herein
below.

### C.  Rule 23(a) Numerosity

98.     The Plaintiffs' Class consists of Puerto Rico residents that during the Class Period
purchased at SSLLC's solicitation over **$180 million** worth of PRMBs and **$101 million** worth
PRCEFs, for a total of over **$281 million**. The Plaintiffs reasonably estimate that due to the money
amounts of the solicited transactions the Class consist of at the least **tens of thousands** of investors.

99.     The exact total number of Class members can be reasonably ascertained from the
records in the possession or under the control of SSLLC.

24

100.    The members of the Class are certainly so numerous that joinder of all members is impracticable.

101.    Individual lawsuits by all Class members are not practical as to most due to the economic cost of the litigation, *vis a vis*, the monetary value of their individual claims which otherwise might well never be vindicated.

102.    The reliefs sought by the Plaintiffs and to which putative Class members are entitled are uniform within the Class.

**D.  Rule 23(a) Commonality Of Facts And Law**

103.    The factual and legal issues raised in this Complaint are common to all Plaintiff and putative Class members inasmuch they arise from the same common nucleus of operative facts and the SSLLC's Scheme to omit and conceal material facts from the Plaintiffs and Class members to have them purchase the PR securities during the Class Period.

104.    The Plaintiff Representatives and Class members have been economically injured in the same manner because of the substantial loss of value of the PR securities that they purchased from SSLLC during the Class Period.

105.    To carry out the Scheme, SSLLC either instructed its FAs to omit material facts to the purchaser Plaintiffs and putative Class members, or concealed the material facts from its FAs to prevent their disclosure to the purchaser Plaintiffs and putative Class members in connection with their purchase of the PR securities.

106.    As a result of the foregoing, all Plaintiffs and Class members were equally omitted and concealed the material facts in connection with their purchase of the PR securities.

107.    The materiality of SSLLC's omissions and concealments create a presumption of reliance that applies equally to the Plaintiffs and all putative Class members.

108.   The materiality of the facts omitted and concealed by SSLLC made the purchase and sale transactions fraudulent because their disclosure would influence the Plaintiffs, putative Class members, and any reasonable person not to purchase the securities.

109.   That is, had the Plaintiffs and putative Class members been informed by SSLLC about those material facts they would have not purchased the securities.

110.   The adjudication of the following material allegations entail issues of fact and or law that are common to all Plaintiffs and Class members:

    a.   that SSLLC either instructed its FAs to omit and conceal material facts to the purchaser Plaintiffs and putative Class members, or that it concealed the material facts from its FAs to prevent their disclosure to the purchaser Plaintiffs and Class members in connection with their purchase of the PR securities;

    b.   that the alleged omissions were material to the purchase transactions;

    c.   that SSLC acted with scienter;

    d.   that the Plaintiffs and Class members sustained economic losses that were caused by the material omissions; and,

    e.   that the alleged material omissions are actionable under the federal securities laws and the laws of PR.

**E.  Rule 23(a) Typicality**

111.   The Plaintiffs and the Class members, each and all, have tangible and legitimate actionable claims and interests at stake in this action.

112.   The claims of the Plaintiffs are typical of the claims of the Class members, all of whom have a common origin and share a common basis of fact and law.

113.   The claims of the Plaintiffs and Class members arise from the same Scheme to Defraud. That is, the claims of the Plaintiffs and Class members arise from the same concealments and omissions of material facts by SSLLC to deceive them to purchase the PR securities during

the Class Period. Thus, the individual characteristics of the Plaintiffs are typical of the ones of the Class members.

114.    SSLLC has acted in the same way toward the Plaintiffs and the members of the Class. As a result, thereof, each Plaintiff has been personally injured by the same illegal conduct of SSLLC in a way that is typical to the injury caused by said conduct to the members of the Class.

115.    The claims of the Plaintiffs will necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief than the claims that can be made by the Class members.

116.    The claims and remedial theories pursued by the Plaintiffs are sufficiently aligned with the interests of Class members to ensure that the claims of the Class will be prosecuted with diligence and care by the Plaintiffs as representatives of the Class.

**F.  Rule 23(a) Adequacy Of Representation**

117.    The claims of the Plaintiffs and the members of the Class that the Plaintiffs are willing and prepared to represent are so interrelated that the interests of the Class members will be adequately protected in their absence by the Plaintiffs, complying with all the obligations and duties material thereto.

118.    The Plaintiffs have no interests that are averse, contrary to, or in conflict with, those of the Class that they seek to represent in this Action.

119.    The self-interests of the Plaintiffs are equal, and not antagonistic, to those of the Class members. The proposed Plaintiff representatives will, thus, undertake to well and truly protect the interests of the Class members.

120.    The Plaintiffs have retained the services of the undersigned counsels. Said counsels are experienced in complex litigation, class actions, and securities litigation, and they will

adequately prosecute this action, and will assert, protect and otherwise well represent the Plaintiffs and Class members.

### G. Rule 23(b)(3)

121.    The preceding allegations show that the relevant questions of law and fact that are common to the members of the Class predominate over any questions affecting only individual members.

122.    Under these circumstances, a Class action is superior to individual claims and may be the only practical method for the fair and efficient adjudication for the vast majority of the controversies alleged in this Complaint, inasmuch as:

      a. Individual claims by the overwhelming majority of Class members are impractical as the costs of litigation in arbitration far exceed what any one Plaintiff or Class member has at stake. Thus, the expense and burden of individual litigation would make it virtually impossible for the vast majority of the members of the Class to individually redress the wrongs done to them by the Defendant.

      b. Of the over tens of thousands potential claims that can be filed against SSLLC for the facts of this Complaint, only a relative small amount has been filed in arbitration.

      c. The proposed Class Action can be readily managed with the assistance of the guidelines contained in the Manual for Complex Litigation adopted by the Federal Judicial Center. There will be no difficulty in the management of this Action as a Class.

### VII.    FRAUDULENT CONCEALMENT EQUITABLE TOLLING

123.    The running of the statutes of limitations applicable to this action have been tolled because of Defendant's fraudulent concealment of its misconduct.

124.    The two years' statute of limitation applicable to the claims under Section 10(b) and Rule 10b-5 begins to run when the Plaintiffs, in the exercise of reasonable diligence, discovered or should have discovered the alleged fraud.

125.    The fifteen years' statute of limitation applicable to the claims under PR contract law start to run when the Plaintiff, in the exercise of reasonable diligence, knew or should have known of SSLLC's fault and the damages that it caused them to sustain.

126.    It was not until on or around **October 13, 2015**, after the AWC Letter was published by FINRA, that it brought into the pubic light that SSLLC's could have omitted material facts in connection to the Plaintiffs and Class members' purchases of PR securities during the Class Period.

127.    It was only then that the Plaintiffs and putative Class members, in the exercise of reasonable diligence, could have discovered the alleged fraud. It was only then that the Plaintiffs and Class members, in the exercise of reasonable diligence, knew or could have known that they have been defrauded by SSLLC in connection with the purchases of the PR securities.

128.    Up to on or around **October 13, 2015**, only SSLLC was privy to the facts making the Scheme, and because of their fraudulent nature it concealed them. Because of SSLLC's fraudulent concealment, until on or around **October 13, 2015**, the Plaintiffs and the Class members were unaware, and could not have reasonably known or learned through reasonable diligence about the Scheme to Defraud alleged in this Complaint.

## VIII.    CAUSES OF ACTION

### A.  First Claim for Relief – Federal Securities' Act Violations

129.    Plaintiffs reproduce and reaffirm, as if alleged herein, each and every one of the preceding allegations.

130.    Through the conduct described above, SSLLC knowingly and willfully violated: Sections 10(b), 15 USCS § 78j,[10] and Exchange Act Rule 10b-5, 17 CFR 240.10b-5,[11] that prohibit fraudulent conduct in connection with the purchase or sale of securities. The Plaintiffs and Class members have a cause of action to receive monetary compensation for all those violations pursuant to 15 USCS § 78aa[12]; and the they also have a cause of action to void the PR securities purchase's agreements pursuant to 15 USCS § 78cc(b) & (c).[13]

---

[10]  It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--
    (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

[11]  It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

[12] (a) In general. The district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this title [15 USCS §§ 78a et seq.] or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title [15 USCS §§ 78a et seq.] or the rules and regulations thereunder.

[13] (b) … Every contract made in violation of any provisions of this title [15 USCS §§ 78a et seq.] or of any rule or regulation thereunder, and every contract . . . heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this title [15 USCS §§ 78a et seq.] or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract,

131.    The factual allegations made above are sufficient to show that: SSLLC made material omissions; with scienter, or a wrongful state of mind; in connection with the Plaintiffs and Class members' purchase of the PR securities; and that as a result of those omissions they were caused to sustain economic loses. Because of the materiality of the omissions a presumption of reliance is created by law.

132.    The rights and remedies provided by the Exchange Act are in addition, and cumulative, to any other rights and remedies that may exist at law or in equity for the benefit of the Plaintiffs and Class members.

133.    Plaintiffs demand herein from SSLLC payment in the full amount of all the trading losses they have sustained, plus interest[14] from the date when the debt accrued and until full payment thereof.

134.    In addition, the PR securities purchase agreements were made in violation of the fore stated anti-fraud securities laws' provisions, and shall all be voided. These contracts should be voided because had it not been because of SSLLC's illicit and fraudulent conduct the Plaintiffs and Class members would not have purchased the PR securities. Because the Plaintiffs and Class members are innocent participants in said violations, they are entitled to the compensation of their trading losses, plus the reimbursement of all monies paid for the price, fees, and other expenses related to the purchase of the securities.

---

[14] Pursuant to Rule 44.3 of the PR Rules of Civil Procedure, when there is a finding of fraud, obstinacy or temerity, the responsible party shall pay interest over the judgment amount to be computed since the time the cause of action arises in every case of collection of money, and from the time the claim is filed in actions for damages, and until the date judgment is pronounced.

**B. Second Claim - Fault, Fraud, Deceit, Recklessness and Negligence**

135.    Plaintiffs reproduce and reaffirm, as if alleged herein, each and every one of the preceding allegations.

136.    The factual allegations made above are sufficient to show that: SSLLC incurred in fraud, fault and/or negligence in the fulfillment and performance of the duties that it owed to the Plaintiffs and Class members pursuant to the account contract, and that they sustained economic loses as a direct thereof. Pursuant to the applicable PR laws, SSLLC shall indemnify the Plaintiffs and Class Members for the trading losses and damages caused thereby. 31 L.P.R.A. § 3018.[15]. SSLLC is liable to indemnify the Plaintiffs and Class members not only for the amount of the trading losses that they have suffered, but also that of the profits which they have failed to realize as a result thereof. 31 L.P.R.A. § 3023.[16]

137.    Under the Account and Financial Agreement, and the suitability and fiduciary standards imposed by FINRA Rules and the PR securities regulations, it was the Defendant's professional responsibility and it had a fiduciary duty to disclose to the Plaintiffs and putative Class members all facts that were material for their decision to purchase the PR securities.

---

[15] "Puerto Rican law imposes the duty of good faith performance on contracting parties. *See An-Port, Inc. v. MBR Industries, Inc.*, 772 F. Supp. 1301, 1314 (D.P.R. 1991) ('The requirement of good faith between the parties in a contract . . . must guide all contacts between the contracting parties during the existence of the relationship.'); *AMECO v. Jaress Corp.*, 1970 PR Sup. LEXIS 80, 98 D.P.R. 838 (1970) (contracting parties have obligations by law that extend 'to cover not only what has been expressly stipulated, but also the consequences which, according to their nature, are in accordance with good faith'); see also P.R. Laws Ann. 31 § 3375 (1990)." *Adria Int'l Group, Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 108-109 (1st Cir. P.R. 2001).

[16] The "[i]ndemnity for losses and damages includes not only the amount of the loss which may have been suffered, but also that of the profit which the creditor may have failed to realize." 31 L.P.R.A. § 3023.

32

138.    Pursuant to the Account and Financial Advisor Agreement, SSLLC is bound, not only with regard to the fulfillment of what was expressly stipulated therein, but also with regard to all the consequences thereof which, according to their character, are in accordance with good faith, use, and law. 31 L.P.R.A. § 3375.

139.    Through the conduct described above, SSLLC is guilty of fraud ("dolo"), deceit, fault, recklessness and/or negligence in fulfilling the contractual and fiduciary obligations that it owed the Plaintiffs and Class members pursuant to the Broker Dealer's Account Contracts. As a result, thereof, SSLLC shall be held to indemnify the Plaintiffs and Class members for all the economic losses and monetary damages that were caused to them as a result of its misconduct. 31 L.P.R.A. § 3018.[17]

140.    Because SSLLC's conduct that caused Plaintiffs and Class members' injury was fraudulent, SSLLC shall also be liable for all the losses and damages suffered by the Plaintiffs and Class members that originate from SSLLC's misconduct whether they were foreseeable or not. 31 L.P.R.A. § 3024.

141.    Plaintiffs and Class members demand herein payment from SSLLC in the full amount of all the economic trading losses that they have sustained, the profits which they have

---

[17] 31 L.P.R.A. §3018, states that "those who in fulfilling their obligations are guilty of fraud, negligence, or delay and those who in any manner whatsoever act in contravention of the stipulations of [their contractual obligations] . . . shall be subject to indemnify for the losses and damages caused thereby." "Puerto Rican law imposes the duty of good faith performance on contracting parties. *See An-Port, Inc. v. MBR Industries, Inc.*, 772 F. Supp. 1301, 1314 (D.P.R. 1991) ('The requirement of good faith between the parties in a contract . . . must guide all contacts between the contracting parties during the existence of the relationship.'); *AMECO v. Jaress Corp.*, 1970 PR Sup. LEXIS 80, 98 D.P.R. 838 (1970) (contracting parties have obligations by law that extend 'to cover not only what has been expressly stipulated, but also the consequences which, according to their nature, are in accordance with good faith'); see also P.R. Laws Ann. 31 § 3375 (1990)." *Adria Int'l Group, Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 108-109 (1st Cir. P.R. 2001).

failed to realize as a result thereof, and all the losses and damages suffered by them that originate from misconduct of SSLLC, plus interest from the date when the debt accrued[18] until full payment thereof.

### C.  Third Claim - Demand for Attorney's Fees, Expenses and Interests

142.    The Plaintiffs and Class members reproduce and reaffirm, as if alleged herein, each and every one of the preceding allegations.

143.    Pursuant to Puerto Rico Rule of Civil Procedure 44.1(a), the prevailing party in litigation is entitled to an award for the costs and expenses necessarily incurred in the litigation.

144.    In addition, pursuant to Puerto Rico Rule of Civil Procedure 44.1(d),[19] a finding of obstinacy must be made against a losing party that take actions that result in a litigation that could have been avoided, that raises groundless claims or defenses, that needlessly protracts or prolongs the litigation, that refuses to recognize liability or an obligation, that obliges the other party to embark on needless procedures, or that otherwise incurs in reckless, obstinate or frivolous litigation conduct. *IOM Corp. v. Brown Forman Corp.*, 627 F.3d 440, 451-452 (1st Cir. 2010).

145.    Once the threshold determination of obstinacy or frivolousness is met, the imposition of attorneys' fees is mandatory *Correa v. Cruisers, a Div. of KCS Int'l, Inc.*, 298 F.3d 13, 30 (1st Cir. 2002). The award of attorney's fees has the purpose to punish, discourage and deter reckless, obstinate or frivolous litigation conduct. *Nieves Huertas v. Padilla*, 189 D.P.R. 698, 701 (2013).

---

[18] *See*, Rule 44.3 of the PR Rules of Civil Procedure, *supra*.

[19] Rule 44.1(d) states that, "[i]n the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct."

146.    When calculating the attorneys' fees that the obstinate or frivolous losing party shall bear, the award amount should be determined in accordance to the degree or intensity of the obstinate or frivolous conduct. In addition, the court may consider factors such as the nature of the action, the questions of law involved and the amounts at issue, the time spent, the efforts and professional activity needed for the case, and the skills and reputation of the lawyers involved. *IOM Corp.*

147.    In addition, pursuant to the laws of the Commonwealth of Puerto Rico, any person or legal entity that is adjudged obstinate is also liable for pre-judgment interest over any monetary award to be accrued since the date of the filing of the Claim in any action for damages, and since the time the cause of action arises in every case of collection of money. *See,* Rule 44.3 of the PR Rules of Civil Procedure, *supra.*

148.    SSLLC's misconduct detailed and described herein above constitutes gross violations of the federal securities laws, the securities contract, and damages' laws and regulations of the Commonwealth of Puerto Rico.

149.    Notwithstanding the above, SSLLC has recklessly, obstinately and frivolously denied any responsibility for the great economic losses that their breaches and misconduct has caused upon the Plaintiffs and Class members, forcing them to file this Claim to seek fair and reasonable monetary compensation for those losses. SSLLC has been obstinate in that, although it has been on notice of the nature and extent of the damages suffered by the Plaintiffs and Class members, it has taken no action on the matter, has denied any liability, and has in fact fomented the filing of this Class action.

150.    The Plaintiffs and Class members request that a substantial award of attorneys' fees is entered against SSLLC. Such award is required herein to punish the SSLLC's fore stated abusive

conduct. The award must be substantial because it must be commensurate and in accordance to the high degree and intensity of the SSLLC's obstinate and frivolous conduct, and because it shall consider the nature of this Action, the issues of fact and law involved, the amounts at issue, the time and efforts spent by the Plaintiffs and their attorneys to obtain recovery, the professional activity needed for the case, and the skills and reputation of the lawyers involved.

151.    Therefore, the Plaintiffs and Class members demand that an award be entered in their favor and against the SSLLC granting them attorneys' fees in the amount to be determined by the Court, plus the reimbursement of all litigation costs and expenses, and legal interest over all the monetary awards from the date when the debt accrued.

## IX.    JURY DEMAND

152.    The Plaintiffs and putative Class members demand trial by jury of all issues of fact.

## X.    PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiffs on their own and on behalf of the putative Class members respectfully request the Court to:

A.    Certify this case as a Class action.

B.    Appoint the undersigned as Class counsel.

C.    Grant all claims for relief requested herein.

D.    Award the Plaintiffs and Class members compensation for their economic losses, in the amount of no less than **$281 million**.

E.    In addition, Order the rescission of the purchase transactions, allowing the Plaintiffs and Class to be reimbursed the prices and fees paid for the securities, and retain compensation for the trading losses and incomes received.

F.    Award the Plaintiffs and Class members reasonable attorneys' fees and prejudgment interest.

36

G.      Any such other and further relief, as the Court deems just and appropriate.

**RESPECTFULLY SUBMITTED, in San Juan, Puerto Rico, this 12th day of October**

**2017.**

/s/Eric Quetglas Jordán                          /s/Luis E. Miñana

**Eric Quetglas-Jordán, Esq.**                  **Luis E. Miñana, Esq.**
QuetglasLaw@gmail.com                           USDC-PR No. 225608
USDC-PR #202514                                 **ESPADA, MIÑANA & PEDROSA LAW**
                                                **OFFICES, PSC**
**QUETGLAS LAW OFFICE, P.S.C.**                 122 Calle Manuel Dómenech
1353 Luis Vigoreaux Ave.                        Altos Urb. Baldrich
PMB 669                                         San Juan, PR  00918
Guaynabo, PR 00966                              minanalaw@yahoo.om
Tel. (787) 722-0635                             Tel.:  (787) 758-1999
www.QuetglasLawPSC.com                          Fax:  (787) 773-0500
                                                Cel. (787) 402-2226
                                                www.securitiesatty.com