# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| JORGE PONSA-RABELL, CARINA PEREZ-CISNEROS ARMENTEROS, and MARILU CADILLA-REBOLLEDO,<br><br>                          Plaintiffs,<br><br>              v.<br><br>SANTANDER SECURITIES, LLC; SANTANDER BANCORP; SANTANDER HOLDINGS USA, INC., BANCO SANTANDER PUERTO RICO; BANCO SANTANDER S.A.,<br><br>                        Defendants. | **Civil Action No. 17-2243 (CCC)**<br><br>ORAL ARGUMENT REQUESTED |

# DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THE MOTION TO DISMISS THE THIRD AMENDED COMPLAINT

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ...................................................................................3

    A.    Santander Securities LLC ..........................................................3

    B.    Puerto Rico Municipal Bonds....................................................4

    C.    PRMB Risk Disclosures .............................................................5

    D.    Puerto Rico Closed-End and Open-End Mutual Funds ..............6

    E.    PRCEF Risk Disclosures ............................................................7

    F.    PRMBs and PRCEFs Were Attractive Investments for
        Puerto Rico Residents .................................................................9

    G.    The August 2013 PRMB Market Downturn ...............................10

    H.    Plaintiffs Commence This Putative Class Action and
        Amend Their Complaint Three Times ........................................11

ARGUMENT ...................................................................................................13

   I.    PLAINTIFFS' EXCHANGE ACT AND COMMONWEALTH
       LAW CLAIMS ARE TIME-BARRED ....................................14

    A.    Plaintiffs' Exchange Act Claims Are Barred by the
        Applicable Two-Year Statute of Limitations..............................14

    B.    Plaintiffs' Commonwealth Law Claims Are Barred by
        PRUSA's Two-Year Statute of Repose ......................................16

   II.   PLAINTIFFS' FEDERAL SECURITIES LAW CLAIMS MUST
       BE DISMISSED FOR FAILURE TO STATE A CLAIM ...................19

    A.    The Complaint Does Not Sufficiently State a Claim Under
        Exchange Act Section 10(b) and Rule 10b-5..............................20

        1.    The Complaint Fails to Plead an Actionable
            Material Misrepresentation or Omission .......................20

            a.    The Allegedly Omitted Risks Related to
                Investing in the Puerto Rico Economy Were,
                In Fact, Disclosed.................................................21

          b.     Alleged Omissions Related to Santander's Inventory Are Not Actionable and, in Any Event, Investors Were Warned of the Risks that Occurred ...................................................................26

     2.     The Complaint Fails to Plead Scienter.............................................31

     3.     The Complaint Fails to Plead Loss Causation ...............................34

          a.     Plaintiffs Cannot Show a Plausible Connection between Their Alleged Losses and Santander's Alleged Misrepresentations or Omissions ....................................................................34

          b.     Plaintiffs Have Failed to Distinguish Their Losses from Adverse Market Conditions ..........................35

   B.     There Is No Private Right of Action Under Section 17(a) of the Securities Act ..........................................................................36

III.     PLAINTIFFS' COMMONWEALTH LAW CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM ...........................................36

IV.     PLAINTIFFS LACK STANDING TO BRING CLAIMS RELATED TO SECURITIES THAT THEY DID NOT PURCHASE.......................................................................................................39

V.     PLAINTIFFS' CLAIMS AGAINST BSSA MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION.............................41

VI.     PLAINTIFFS' CLAIMS AGAINST BANCORP, SHUSA, BSPR, AND BSSA MUST BE DISMISSED BECAUSE THE TAC FAILS TO PLEAD ANY CONDUCT BY THOSE DEFENDANTS ...................................................................................................41

CONCLUSION...............................................................................................................42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
512 F.3d 46 (1st Cir. 2008) ......................................................................19, 31

*Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*,
374 F.3d 23 (1st Cir. 2004) ..............................................................................36

*Ambert v. Caribe Equity Grp., Inc.*,
Civil No. 11-1254, 2011 WL 4626012 (D.P.R. Sept. 30, 2011) .......................17

*In re Ariad Pharm., Inc. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016) .......................................................................31, 39

*Asociación de Enfermería Visitante Auffant, Inc. v. Great-West Life & Annuity Ins. Co.*,
825 F. Supp. 2d 349 (D.P.R. 2011) ..................................................................16

*In re Cabletron Sys., Inc.*,
311 F.3d 11 (1st Cir. 2002) ..............................................................................21

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1994) ..........................................................................................21

*Chiarella v. United States*,
445 U.S. 222 (1980) ..........................................................................................26

*Credit Suisse Sec. (USA) LLC v. Simmonds*,
566 U.S. 221 (2012) ..........................................................................................18

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) ..........................................................................................41

*Diaz v. Rivera*,
217 F. Supp. 3d 464 (D.P.R. 2016) ...................................................................18

*Dist. Bus. Conduct Comm. for Dist. No. 7 v. William A. Lobb*,
2000 WL 1299576 (N.A.S.D.R. Apr. 6, 2000) .................................................38

*Dopp v. HTP Corp.*,
947 F.2d 506 (1st Cir. 1991) ............................................................................38

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) .....................................................................................34, 35

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011)................................................................................35

*Fernandez v. UBS AG*,
  222 F. Supp. 3d 358 (S.D.N.Y. 2016).................................................17

*FirstBank P.R., Inc. v. La Vida Merger Sub, Inc.*,
  638 F.3d 37 (1st Cir. 2011)....................................................................14

*In re GAP Sec. Litig.*,
  No. 89-16098, 1991 WL 17091 (9th Cir. Feb. 8, 1991) .........................27

*Garvey v. Arkoosh*,
  354 F. Supp. 2d 73 (D. Mass. 2005) ......................................................33

*Glassman v. Computervision Corp.*,
  90 F.3d 617 (1st Cir. 1996)....................................................................27

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008)..............................................39, 40

*Instituto de Educacion Universal, Inc. v. Great Lakes Higher Educ. Corp.*,
  No. 98-1300, 2001 WL 1636686 (D.P.R. Sept. 28, 2001 ......................37

*Janus Capital Grp., Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011)................................................................................42

*Kader v. Sarepta Therapeutics, Inc.*,
  887 F.3d 48 (1st Cir. 2018)....................................................................32

*In re Lehman Bros. Sec. & ERISA Litig.*,
  684 F. Supp. 2d 485 (S.D.N.Y. 2010), *aff'd*, 650 F.3d 167 (2d Cir. 2011) ............................40

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005)..................................................................35

*Maldonado v. Dominguez*,
  137 F.3d 1 (1st Cir. 1998)................................................................31, 36

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)............................................................................20, 26

*Merck & Co., Inc. v. Reynolds*,
  559 U.S. 633 (2010)..........................................................................14, 15

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  218 F.R.D. 76 (S.D.N.Y. 2003) ............................................................31

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003)...................................................................22

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
   537 F.3d 35 (1st Cir. 2008)...........................................................................20

*Portugues-Santana v. Rekomdiv Int'l*,
   657 F.3d 56 (1st Cir. 2011)...........................................................................38

*Powers v. Bos. Cooper Corp.*,
   926 F.2d 109 (1st Cir. 1991)...........................................................................19

*Ret. Sys. v. ANZ Sec., Inc.*,
   137 S. Ct. 2042 (2017).....................................................................................18

*S.E.C. v. Tambone*,
   550 F.3d 106 (1st Cir. 2008).........................................................................34

*S.E.C. v. Tambone*,
   597 F.3d 436 (1st Cir. 2010).........................................................................19

*Scottsdale Capital Advisors Corp. v. The Deal, LLC*,
   887 F.3d 17 (1st Cir. 2018)...........................................................................41

*Estate of Soler v. Rodriguez*,
   63 F.3d 45 (1st Cir. 1995).............................................................................39

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
   365 F.3d 353 (5th Cir. 2004).........................................................................42

*In re Stone & Webster, Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005).........................................................................33

*Suna v. Bailey Corp.*,
   107 F.3d 64 (1st Cir. 1997)...........................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007).......................................................................................31

*In re The First Marblehead Corp. Sec. Litig.*,
   639 F. Supp. 2d 145 (D. Mass. 2009) ...............................................22, 33, 35

*In re Ultrafem Inc. Sec. Litig.*,
   91 F. Supp. 2d 678 (S.D.N.Y. 2000)..............................................................16

*Urman v. Novelos Therapeutics, Inc.*,
   867 F. Supp. 2d 190 (D. Mass. 2012) ...........................................................34

*Vetter v. Shearson Hayden Stone Inc.,*
    481 F. Supp. 64 (S.D.N.Y. 1979) ........................................................37

*Wilson v. Merrill Lynch & Co.,*
    671 F.3d 120 (2d Cir. 2011)..............................................................27

*United States ex rel. Winkelman v. CVS Caremark Corp.,*
    827 F.3d 201 (1st Cir. 2016).................................................................3

*Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.,*
    341 F. Supp. 2d 258 (S.D.N.Y. 2004)................................................18

**Statutes**

10 L.P.R.A § 890(e) ...............................................................................16

15 U.S.C. §§ 77a et seq............................................................................36

15 U.S.C. § 77q(a)(1)-(3) ........................................................................12

15 U.S.C. § 78u-4(a)-(b) ...........................................................11, 19, 31

28 U.S.C. § 1658(b) ................................................................................14

**Other Authorities**

17 C.F.R. § 240.10b-5...........................................................................21

17 C.F.R. § 240.15c2-12..........................................................................4

Defendants Santander Securities LLC ("SSLLC"), Santander Bancorp ("Bancorp"), Santander Holdings USA, Inc. ("SHUSA"), Banco Santander Puerto Rico ("BSPR"), and Banco Santander S.A. ("BSSA") (collectively, "Santander" or "Defendants") respectfully submit this memorandum of law in support of their joint motion to dismiss Plaintiffs' Operative Complaint (Dkt. No. 45) (the "Complaint," "Third Amended Complaint," or "TAC") pursuant to Rules 9(b), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP").

## PRELIMINARY STATEMENT

This is a motion to dismiss a securities fraud complaint brought by three plaintiffs, who together purchased just *four* securities, but who purport to represent a class of tens of thousands of investors that purchased Puerto Rico municipal bonds and mutual funds.  The Complaint is sprawling and audacious:  Plaintiffs spin a story about a nefarious "Scheme to Defraud" and assert every conceivable cause of action pertaining to the purchase of securities, including claims under the Securities Exchange Act of 1934 (the "Exchange Act"), the Securities Act of 1933 (the "Securities Act"), and Puerto Rico statutory and common law ("Commonwealth Law").  But despite all of the bravado in the Complaint, it reflects a fundamental misunderstanding of securities fraud pleading requirements, and it fails to plead a single claim sufficient to pass muster under Rules 9(b) and 12(b)(6).  As demonstrated herein, the Court should dismiss Plaintiffs' claims for several independent reasons:

*First*, Plaintiffs' Exchange Act and Commonwealth Law claims are time-barred.  The claims under the Exchange Act are subject to a two-year statute of limitations, which accrues as of the date the Plaintiffs knew or should have known of the purported basis for their claims. Plaintiffs' own allegations leave no doubt that they were on notice of their claims as early as *2012* or *2013*, well more than two years prior to commencing this action in October *2017*. Likewise, all of Plaintiffs' Commonwealth Law claims are subject to the two-year statute of

repose in the Puerto Rico Uniform Securities Act ("PRUSA"), which is measured from the date of the securities transaction.  Accordingly, because all of the purchases at issue here allegedly took place prior to October 2013, these claims are barred by PRUSA.

_Second_, the claims for violation of federal securities laws also must be dismissed for failure to state a claim.  With respect to the Exchange Act claims, the Complaint does not plead _any_ of the necessary elements:  Plaintiffs do not allege any material omission; they do not allege any facts sufficient to raise a strong inference of fraudulent intent; they do not even attempt to satisfy the loss causation pleading requirement; and they fail to allege any of the elements of their claims with the particularity required by the FRCP.  Likewise, the Court must dismiss Plaintiffs' claim for violation of Section 17(a) of the Securities Act because that statute does not provide for a private right of action.

_Third_, the claims for violation of Commonwealth Law, which Plaintiffs style as "fault, fraud, deceit, recklessness and negligence" causes of action, also fail as a matter of law. Regardless of how Plaintiffs characterize those claims, they are fraud claims and are subject to stringent pleading requirements, which the Complaint fails woefully to satisfy.

_Fourth_, under well-settled law, Plaintiffs lack standing to assert claims pertaining to securities they themselves did not purchase, and therefore the Court should dismiss any claims beyond those relating to the **four** securities – three bonds and one mutual fund – that plaintiffs themselves purchased.  This is not a class certification issue; it is a fundamental pleading deficiency that warrants dismissal on this Motion.

_Fifth_, Plaintiffs have not pled any facts to establish personal jurisdiction over BSSA and, accordingly, all claims against BSSA must be dismissed for that reason alone.

*Finally*, Plaintiffs have not alleged *any* conduct by any defendant other than SSLLC, and therefore the claims against Bancorp, SHUSA, BSPR, and BSSA should be dismissed on that separate, independent basis.

This is Plaintiffs' third opportunity to sufficiently plead securities fraud claims, and they have failed.  The Court should grant the Motion and dismiss this action in its entirety and with prejudice.

## STATEMENT OF FACTS[1]

### A.    Santander Securities LLC

During the relevant time period here, SSLLC was a securities and money management firm that delivered brokerage services to clients in, among other places, Puerto Rico.  *See* TAC ¶ 39.  These services included purchasing and selling corporate equity and debts, mutual funds, municipal securities, and annuity products.  Between approximately 2004 and 2012, SSLLC served as an underwriter (typically as a member of an underwriting syndicate of several banks) of dozens of Puerto Rico Municipal Bonds ("PRMBs") and distributed nearly a dozen Puerto Rico Closed End Mutual Funds ("PRCEFs") and Open End Mutual Funds ("PROEFs").  *See* TAC ¶¶ 48, 57, 65-68, 79.[2]

---

[1]    The "facts" contained in this section are drawn primarily from the allegations in the TAC, which are assumed to be true for the purposes of this motion only, the documents referenced therein, and certain SEC filings or other publicly-available documents.  Exhibit references ("Ex. __") are to the exhibits appended to this Motion.  All documents or other information referred to herein are capable of judicial notice and are appropriate to consider in connection with this Motion.  *See, e.g.*, *United States ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 208 (1st Cir. 2016) (noting that, "even within the Rule 12(b)(6) framework, a court may consider matters of public record and facts susceptible to judicial notice" such as press releases, news articles, and publicly disclosed records).

[2]    The TAC also names Bancorp, SHUSA, BSPR, and BSSA as defendants.  *See* TAC ¶¶ 37-44.  As discussed in Part VI, *infra*, however, the Complaint lacks any particularized allegations with respect to *any* Defendant other than SSLLC and, therefore, must be dismissed as against those other Defendants.

## B.     Puerto Rico Municipal Bonds

PRMBs are debt instruments issued by the Government of Puerto Rico and certain of its instrumentalities in order to finance their operations.  *See* TAC ¶ 47.  Generally, purchasers of these securities loan money to the issuer in exchange for a set number of interest payments over a predetermined period of time.  At the end of that period, the bonds reach their maturity date and the issuer is expected to return to the security holder the full amount of the original investment.  *Id*.  If the issuer cannot meet its financial obligations, it may fail to make scheduled interest payments or fail to repay the principal investment upon maturity.  Ratings agencies such as Moody's Investors Service ("Moody's") and Standard & Poor's ("S&P") publicly rate a bond issuer's likely ability to meet its debt obligations in order to assist customers in evaluating the issuer's creditworthiness.[3]

Each PRMB underwritten by SSLLC was marketed to the public via a prospectus (also known as an offering statement or "official statement") that provided investors with information necessary to determine whether to invest.[4]  This initial disclosure was followed by subsequent annual disclosures of financial information and any other material events such as rating changes, insolvency, or adverse tax opinions.[5]  In addition to financial institutions like SSLLC mailing or otherwise transmitting these documents to security holders, these disclosures were made readily available to consumers through the Municipal Securities Rulemaking Board's free online website, known as "EMMA."  *See* https://emma.msrb.org/.

---

[3]     *See* MSRB, *Credit Rating Basics for Municipal Bond Investors* (2018), http://www.msrb.org/~/media/Files/Education/Credit-Rating-Basics-for-Municipal-Bond-Investors.ashx??.

[4]     *See, e.g.*, Ex. 1 (COFINA Bond Prospectus).

[5]     *See, e.g.*, Ex. 5 (COFINA Bond Annual Report); *see also* 17 C.F.R. § 240.15c2-12 (providing list of events requiring disclosure by issuer).

### C.     PRMB Risk Disclosures

The disclosures for each of the relevant PRMBs underwritten by SSLLC provided critical information concerning the risks associated with purchase of those bonds, including the financial health of the issuing municipality.  These disclosures included the bond prospectus and its related appendices, annual financial information statements that evaluated any changed market conditions, and periodic notices of any significant bond rating downgrade.

For example, with respect to one of the securities at issue in this action – the COFINA Bond (defined below) – a current or prospective investor had access to a wealth of comprehensive public disclosures during the time period relevant here.[6]  First, the COFINA Bond's prospectus clearly explained the various risks that were assumed by investors in the securities.  Indeed, the "RISK FACTORS" section of the prospectus began by cautioning that:

> *Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Offered Bonds as well as other information contained in this Official Statement . . . Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Offered Bonds . . . .*

*See, e.g.*, Ex. 1 (COFINA Bond Prospectus) at 29.  Among the COFINA Bond's clearly disclosed risks were:  (i) that the revenues from the bonds depended on, among other factors, economic conditions in the Commonwealth (and that the Commonwealth had been in a recession since 2006); (ii) that a ratings downgrade may have an adverse effect on the market prices of the bonds; and (iii) that there was no assurance that the bonds would continue to be a liquid investment – *i.e.*, that investors might not be able to sell their bonds.  *See, e.g.*, *id.* at 29, 31-32, 41.

---

[6]     Although SSLLC primarily uses the COFINA Bond's disclosures as an exemplar throughout this memorandum, submitted herewith are exhibits highlighting the same or similar disclosures concerning the other PRMBs at issue.  *See* Exs. 2-3, 6-7, 9-11, 13.

Following the initial issuance of the COFINA Bond in 2010, current and prospective investors were provided with periodic updates regarding any material changes or noteworthy events.  For instance, on July 19, 2012, investors received notice that Moody's had downgraded the bond's credit rating from Aa2 to Aa3, and also warned of the likely underperformance of Puerto Rico's economy:

> The **downgrades reflect our view of the increased risk in the bonds' escalating debt service structure** as a result of the effects on Puerto Rico's economy of the extended recession coupled with structural changes in the manufacturing sector due to the phase-out of territorial tax benefits and exposure to greater global competitive forces.  The combined result is that **the commonwealth's economy is expected to underperform** compared to the US economy, **decreasing the likelihood that sales tax collections will achieve the growth necessary to maintain levels of debt service coverage consistent with prior rating levels** and compared with other credits at that rating level.

Ex. 12 (July 19, 2012 Investor Disclosure concerning Moody's July 18, 2012 Rating Downgrade) at 3 (emphasis added).

These and similar disclosures were made available to investors prior to purchase and continuously throughout the relevant time period here, and they provided comprehensive information about the PRMBs.

### D.    Puerto Rico Closed-End and Open-End Mutual Funds

Broadly defined, a mutual fund is a company that pools money from numerous investors and invests that capital in stocks, bonds or other assets.  *See* TAC ¶¶ 73-75.[7]  The combined holdings of stocks, bonds or other assets the fund owns are known as its portfolio.  *See id.*  Each investor in the fund owns shares, which represent ownership of a portion of these holdings.  The PRCEFs at issue in this action are closed-end, non-diversified investment management

---

[7]    *See also* SEC, *Mutual Fund*, https://www.sec.gov/investor/tools/mfcc/mutual-fund-help.htm (last accessed May 21, 2019).

companies incorporated in Puerto Rico and registered under the Puerto Rico Investment

Companies Act, shares of which were sold exclusively to residents of Puerto Rico.  Each fund

belongs to a broader group of Santander mutual funds (the "First Puerto Rico Family of Funds")

formed and sold over a period of approximately ten years, beginning in or around September

2001.  For the period relevant here, SSLLC sold the Funds' shares.  *See* Ex. 4 (Tarsan II Fund

Prospectus) at Nov. 1, 2001 Supplement.

The First Puerto Rico Family of Funds also includes a smaller number of open-ended

mutual funds.[8]  These funds likewise are non-diversified management investment companies

registered under the Puerto Rico Investment Companies Act and sold by SSLLC;[9] however,

unlike PRCEFs, which hold a fixed number of shares that are traded at prices determined by a

secondary market, PROEFs offer a theoretically unlimited number of shares that are priced on a

daily basis based on the value of the fund's underlying securities.  *Id.* at 37.[10]

### E.   PRCEF Risk Disclosures

Much like the PRMBs, each PRCEF was sold pursuant to a prospectus, which disclosed

the fund's investment policies, risk factors, tax consequences, and expenses, among other

relevant information.  In addition, supplemental documents were made available to investors,

including annual reports, quarterly fact sheets and holding reports.

---

[8]      *See* Santander Sec., *First Puerto Rico Family of Funds*,
http://puertorico.santandersecurities.com/SecuritiesFamFunds/sec_family_funds.aspx.

[9]      First Puerto Rico AAA Fixed-Income Fund, *Prospectus* cover 1, 44-45 (June 27, 2011),
http://puertorico.santandersecurities.com/SecuritiesFamFunds/pdf/Prospectus/prospectus2018/Pue
rto%20Rico%20AAA%20Fixed%20Income%20Fund%20with%2011-28-2018%20Sticker.pdf .

[10]     Presumably because Plaintiffs did not purchase a single PROEF, they allege virtually
nothing about them in the TAC.  *See, e.g.*, TAC ¶¶ 28, 32, 36; *see also* Part IV, *infra*.
Accordingly, this memorandum focuses primarily on the marketing and sale of PRCEFs, but
Defendants note that the offering documents and subsequent disclosures of the PROEFs are
substantially similar.

For example, during the relevant period for this action, an investor in the Tarsan II Fund (defined below) had access to, among other things, the Tarsan II Fund prospectus (dated September 28, 2001) and annual reports for each subsequent year.  The Prospectus' cover page alone reflected certain high-level disclosures regarding the Fund's investment strategies and risks, including that:

- Normally, at least 67% of the Fund's asset[s] must be invested in Puerto Rico securities.

- The Fund is subject to risks which may result in a loss of your investment.

- While the use of leverage provides the opportunity for increased net income, it can create special risks, including higher volatility of the net asset value and the market value of the shares of the Fund.

- There is no assurance that the shares of the Fund will trade at an amount equal to or higher than their net asset value or their initial offering price.

- The value of the shares of the Fund will depend on the value of the underlying investments held by the Fund which will fluctuate with general market and economic conditions and other factors which may be beyond the control of the Fund.

Ex. 4 (Tarsan II Fund Prospectus) at cover 1-2.  Following the cover page was a four-page Prospectus Summary which disclosed, among other things, additional information about the risks associated with using leverage (*i.e.*, incurring debt to increase investment amounts and potential returns) and the possibility that investors may be unable to sell their shares.  Elsewhere in the Prospectus was a section titled "RISK FACTORS AND SPECIAL CONSIDERATIONS," which warned that:

- [T]he Fund's investments may be negatively affected by the broad investment environment in the U.S., Puerto Rico and international securities markets, which may be influenced by, among other things, interest rates, inflation, politics, fiscal policy and current events.

- [T]he Fund may be subject to greater risk with respect to its portfolio securities than a "diversified" fund because changes in the financial condition or market

8

assessment of a single issuer may cause greater fluctuation in the net asset value of the Fund's shares.

- [T]he Fund intends to invest 67% of its portfolio in Puerto Rico obligations [and, as a result,] will be less diversified geographically than a fund investing across many states and therefore has greater exposure to adverse economic and political changes in Puerto Rico.

- Puerto Rico debt obligations may have periods of illiquidity [and that these] factors may affect the Fund's ability to acquire or dispose of such securities, as well as the price paid or received upon such purchase or sale by the Fund.

*Id.* at 6, 7, 9.

In sum, like PRMB investors, prospective and actual purchasers of the mutual funds were fully apprised of the risks associated with those securities and were kept informed of material changes at all times relevant to this action.

F.    **PRMBs and PRCEFs Were Attractive Investments for Puerto Rico Residents**

Notwithstanding the clearly-disclosed risk factors discussed above, the PRMBs and PRCEFs at issue in this action were particularly profitable investment opportunities for Puerto Rico residents prior to the Commonwealth's economic downturn. PRMBs and PRCEFs generally offered a higher rate of interest than other comparable investments. These investments also were wholly exempt from Puerto Rico and U.S. income and estate taxes when purchased by Puerto Rico residents. *See* TAC ¶ 73. These tax benefits and significant interest rates were buttressed by the relative safety of PRMBs and PRCEFs historically. Indeed, before the 2013 market decline discussed below, PRMBs were generally regarded as safe and successful investments. During March 2008, for example, S&P reaffirmed the investment grade credit rating of Puerto Rico's outstanding bonds and acknowledged improvements in expenditure

controls made by the local government since 2006.[11]  Likewise, in 2009 both S&P and Moody's raised the ratings on bonds issued by the Puerto Rico Sales Tax Financing Corporation to high quality level (AA/Aa).  The upward trend continued into 2010, when Moody's gave the island's Central government bonds an A3 rating.[12]  S&P followed suit in 2011 when it upgraded Puerto Rico's general obligation debt, lauding the fiscal measures adopted by the local government.[13]  Puerto Rico's economy boasted a positive outlook during this time.  This was evidenced in February 2012 by the economic activity index's signs of positive growth, a trend that continued throughout 2012.[14]  With few exceptions, PRMBs retained investment grade ratings throughout 2012, and prices generally remained steady until the late summer of 2013.

### G.      The August 2013 PRMB Market Downturn

In late summer 2013, deteriorating economic trends affected the U.S. municipal bond market.  *See* TAC ¶ 72.  This was exemplified by the City of Detroit's July 2013 bankruptcy, which was followed by the financial press singling out Puerto Rico as another governmental body at risk of defaulting on its obligations.  *Id.*  These events triggered a period of heightened

---

[11]      *See* Ex. 15 (March 18, 2008 GDB Press Release, "Standard & Poor's Recognizes Improved Expenditure Controls in Maintaining Investment Grade Rating for Commonwealth Debt").

[12]      *See* Ex. 16 (April 21, 2010 GDB Press Release, "Puerto Rico Bonds Safe from Junk Status Danger"); *see also* Ex. 17 (August 10, 2010 GDB Press Release, "Moody's Reaffirms A3 Rating for Puerto Rico's Credit").

[13]      *See* Ex. 18 (March 7, 2011 GDB Press Release, "Puerto Rico Gets Good Marks from S&P for Fiscal and Economic Progress").

[14]      *See, e.g.*, Exs. 19 (February 10, 2012 GDB Press Release, "Puerto Rico's Economic Activity Index Shows First Positive Growth Since March 2006"); 20 (April 10, 2012 GDB Press Release, "Economic Activity Index Continues on Positive Terrain in 2012"); 21 (May 16, 2012 GDB Press Release, "Economic Activity Index Marks First Positive Quarter Since 2006"); 22 (August 9, 2012 GDB Press Release, "Economic Activity Index Remains on a Positive Path for More than Six Months").

volatility, rising yields, and downward pressure on the price of Puerto Rico bonds.[15] Unfortunately, this volatility had a negative impact on the price and liquidity of Puerto Rico bonds and the value of closed-end funds, like the PRCEFs, that were heavily invested in the bonds.

### H.   Plaintiffs Commence This Putative Class Action and Amend Their Complaint Three Times

On October 12, 2017, plaintiffs Jorge Ponsa-Rabell and Carina Pérez-Cisneros Armenteros commenced this action by filing a complaint against SSLLC only.  *See* Dkt. No. 1. That initial complaint asserted claims for violation of the Exchange Act and Commonwealth Law, and purported to seek relief on behalf of a class of purchasers of certain unspecified PRMBs and PRCEFs.  On November 6, 2017, Plaintiffs amended the complaint for the first time and added Bancorp, SHUSA, BSPR, and BSSA as defendants, without alleging any specific conduct by any of those entities or otherwise supporting those claims.  *See* Dkt. No. 6.  Several months later, on April 9, 2018, Plaintiffs amended their pleading for a second time, adding Marilú Cadilla-Rebolledo as a named plaintiff and purporting to bring claims on behalf of purchasers of unnamed PROEFs as well.  *See* Dkt. No. 19.  In connection with their second amended complaint, the three named plaintiffs for the first time included certifications, as required by the Private Securities Litigation Reform Act (the "PSLRA"), that set forth the securities that each allegedly purchased from SSLLC.  *See* 15 U.S.C. § 78u-4(a)(2).  Plaintiffs later moved for appointment as lead plaintiffs pursuant to the PSLRA (*see id.* § 78u-4(a)(3)(B)) and the Court granted their motion on January 28, 2019.  *See* Dkt. No. 41.

---

[15]     *See, e.g.*, Carla Fried, *Municipal Bonds, Stung Again*, N.Y. Times, Oct. 5, 2013, *available at* https://www.nytimes.com/2013/10/06/business/mutfund/municipal-bonds-stung-again.html.

On March 26, 2019, Plaintiffs filed the TAC – their *third* amended pleading – which they titled the "Operative" Complaint.  *See* Dkt. No. 45.  The TAC asserts claims for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder (*see* TAC ¶¶ 152-57) and "fraud ('dolo'), deceit, fault, recklessness and/or negligence" pursuant to the law of the Commonwealth (*see id.* ¶¶ 166-73).  Unlike the prior complaints, the TAC also asserts a claim for violation of Sections 17(a)(1)-(3) of the Securities Act, 15 U.S.C. § 77q(a)(1)-(3).  *See* TAC ¶¶ 158-65.

The gravamen of the Complaint is that Plaintiffs and the class that they seek to represent were damaged because Defendants devised a "scheme to defraud" investors in Puerto Rico bonds and funds by omitting three categories of information:  (*1*) information regarding the health of the Puerto Rico economy and the securities' exposure to price fluctuation caused by economic conditions; (*2*) information about Defendants' own views of the economy and of the risks of owning the Purchased Securities; and (*3*) information about Defendants' proprietary in-house positions (meaning, the extent to which SSLLC held certain of the securities in its own inventory).  *See, e.g.*, TAC ¶¶ 103-04.

The TAC purports to assert claims on behalf of a broad putative class comprising "[a]ll persons or entities that purchased Puerto Rico Municipal Bonds, Puerto Rico Closed End Funds, or Puerto Rico Funds from [SSLLC] during the period covering from *December 2012 through October 2013*" (the "Class Period").  *Id*. ¶ 116.  In other words, Plaintiffs seek to prosecute claims on behalf of anyone who purchased from SSLLC *any* PRMB, PRCEF, or PROEF during that ten-month period.  According to the TAC and the plaintiff certifications filed therewith, however, the three Plaintiffs purchased a total of only *four* securities – three PRMBs and one PRCEF:

1.     The Puerto Rico Sales Tax Financing Corporation's First Subordinate Series 2010D Sales Tax Revenue Bond (the "**COFINA Bond**"), allegedly purchased by plaintiff Jorge Ponsa-Rabell (*see id.* ¶ 28; *see also* Dkt. No. 45-2);

2.     The Puerto Rico Government Development Bank's 2010 Series A Senior Notes (the "**GDB Bond**"), allegedly purchased by plaintiff Carina Pérez-Cisneros Armenteros (*see* TAC ¶ 32; *see also* Dkt. No. 45-3);

3.     The Commonwealth of Puerto Rico's Series 2008 C Public Improvement Refunding Bonds (the "**PIR Bond**"), allegedly purchased by Marilú Cadilla-Rebolledo on behalf of her children (*see* TAC ¶ 36; *see also* Dkt. No. 45-4); and

4.     The First Puerto Rico Tax-Exempt Target Maturity Fund II, Inc. (the "**Tarsan II Fund**"), also allegedly purchased by Marilú Cadilla-Rebolledo on behalf of her children (*see id.*).

The COFINA Bond, the GDB Bond and the PIR Bond are referred to herein as the "Purchased Bonds" and, collectively, all of the securities purchased by Plaintiffs are referred to herein as the "Purchased Securities."

## ARGUMENT

The TAC must be dismissed for several independent reasons, each discussed in greater detail below.  *First*, each and every one of Plaintiffs' causes of action is time-barred under applicable statutes of limitation and/or repose pursuant to federal or Puerto Rico law.  (*See* Part I.)  *Second*, each of Plaintiffs' claims is inadequately pled.  Indeed, with respect to Plaintiffs' claims for violation of the Exchange Act, the TAC does not plead *any* of the critical elements of that cause of action:  Plaintiffs utterly fail to sufficiently allege a material misrepresentation or omission, scienter, or loss causation.  (*See* Part II.A.)  Plaintiffs' claim for violation of Section 17(a) of the Securities Act is entirely meritless because that statutory provision does not create a private right of action.  (*See* Part II.B.)  *Third*, Plaintiffs' causes of action under Commonwealth Law also must be dismissed because, among other reasons, the TAC does not sufficiently allege any intent to defraud or the breach of any duty owed by Defendants to Plaintiffs.  (*See* Part III.)

*Fourth*, Plaintiffs lack standing to assert claims concerning securities that they did not themselves purchase, and any claims related to those securities must be dismissed.  (*See* Part IV.) *Fifth*, Plaintiffs have not pled any facts to establish personal jurisdiction over BSSA and, accordingly, all claims against BSSA must be dismissed for that reason alone.  (*See* Part V.) *Finally*, Plaintiffs have made *no* particularized allegations with respect to any defendant other than SSLLC and, therefore, the claims against Bancorp, SHUSA, BSPR, and BSSA should be dismissed.  (*See* Part VI.)

## I.   PLAINTIFFS' EXCHANGE ACT AND COMMONWEALTH LAW CLAIMS ARE TIME-BARRED

Plaintiffs' claims under the Exchange Act and Commonwealth Law must be dismissed pursuant to applicable statutes of limitations and/or repose.  As established below, Plaintiffs' Exchange Act claims are time-barred by that statute's two-year statute of limitations, while the Commonwealth Law claims are subject to and time-barred by the two-year statute of repose in PRUSA.

### A.   Plaintiffs' Exchange Act Claims Are Barred by the Applicable Two-Year Statute of Limitations

Claims brought under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder are timely only if filed not later than the earlier of two years after a plaintiff's discovery of the alleged violation or five years after such violation.  *See* 28 U.S.C. § 1658(b); *see also FirstBank P.R., Inc. v. La Vida Merger Sub, Inc.*, 638 F.3d 37, 39-40 (1st Cir. 2011) (affirming dismissal of 10b-5 claim and explaining that two-year statute of limitations begins running "(1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation' – whichever comes first.") (quoting *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 637 (2010)).

Here, because Plaintiffs filed their initial complaint on October 12, 2017 (*see* Dkt. No. 1), the Exchange Act's two-year statute of limitations bars any claims that accrued prior to October 12, *2015*. The TAC is brought on behalf of a putative class of investors who purchased securities from December 1, 2012 through October 31, 2013 (*see* TAC ¶ 1), years before the limitations period deadline. Under well-settled law, therefore, Plaintiffs' claims are timely *only if* the TAC demonstrates that a "reasonably diligent plaintiff" could not have discovered his or her claims on or before October 12, 2015. *Merck*, 559 U.S. at 637. Plaintiffs have not made a plausible showing, however, that they were unaware of the facts underlying their claims at that time. Indeed, Plaintiffs unmistakably could have discovered – and in fact *did* discover – the alleged facts in the TAC years before October 2015. The crux of the TAC and its predecessor complaints is the abrupt downturn of the PRMB market that occurred in and around August 2013. *See, e.g.*, TAC ¶¶ 72, 104. Each and every one of the "material facts" that Plaintiffs allege signaled "the decline of the PR economy and the risk of the investments in PR Securities" (*id.* ¶ 72) was publicly known long before 2015, not just by SSLLC but by the investing public and Plaintiffs. The TAC itself cites a list of "red flags and 'material facts' known by SSLLC" concerning the risks of investing in PRMBs and PRCEFs (*see id.*), but each of these facts were widely known or easily discoverable between 2012 and 2013, and several were the subject of disclosures by SSLLC to investors before they even purchased.

For example, Plaintiffs allege that "[o]n December 12, 2012, multiple articles predicted the Detroit Bankruptcy that later took place in 2013," which allegedly was a harbinger of Puerto Rico's eventual insolvency. *Id.* By definition, the fact that *multiple articles* discussed this potential event makes it publicly available and known not just by SSLLC, but by the investing public. Indeed, it was front page news in major publications. *See, e.g.*, Ex. 24 (Monica Davey,

*State May Oversee Detroit's Finances*, N.Y. Times (Dec. 5, 2012)).  Similarly, Plaintiffs point to two separate downgrades of Moody's credit ratings for Puerto Rico General Obligation Bonds. *See* TAC ¶ 72.  Here too, however, those downgrades were the subject of specific public disclosures and were well known by the investing community at the time.  *See* Exs. 10 (August 10, 2011 Investor Disclosure concerning Moody's August 8, 2011 Rating Downgrade); 13 (December 14, 2012 Investor Disclosure concerning Moody's December 13, 2012 Rating Downgrade).

Accordingly, Plaintiffs have in their very own pleading conceded that they were on notice of the "red flags" signaling the alleged omissions underlying their claims as early as 2012.[16]  The failure to file their Exchange Act claims by August 2015 therefore renders those claims untimely and warrants dismissal as a matter of law.  *See In re Ultrafem Inc. Sec. Litig.*, 91 F. Supp. 2d 678, 692 (S.D.N.Y. 2000) (dismissing securities fraud claims as untimely where newspaper articles and other public information placed plaintiffs on inquiry notice of their claims prior to the applicable limitations period).[17]

**B.    Plaintiffs' Commonwealth Law Claims Are Barred by PRUSA's Two-Year Statute of Repose**

Plaintiffs' Commonwealth Law claims – *i.e.*, fault, fraud, deceit, recklessness, and negligence (*see* TAC ¶¶ 166-73) – likewise are barred by the two-year statute of repose in PRUSA.  PRUSA expressly prohibits a plaintiff from initiating a claim "more than two (2) years after the sale contract has been executed."  10 L.P.R.A § 890(e); *see also Asociación de*

---

[16]    As discussed *infra* at Part II.A.1.b, Plaintiffs' remaining allegations related to Santander's bond inventory are non-actionable and do not change this analysis.

[17]    The statute of limitations applicable to Plaintiffs' claim under Section 17(a) of the Securities Act is not addressed because, as discussed *infra* at Part II.B, there is no private right of action pursuant to that provision so the claim must be dismissed on that basis alone.

*Enfermeria Visitante Auffant, Inc. v. Great-West Life & Annuity Ins. Co.*, 825 F. Supp. 2d 349, 351-52 (D.P.R. 2011) (dismissing PRUSA claim filed more than two years after defendant sold security to plaintiff).  This two-year bar applies not only to claims brought expressly under PRUSA, but also to any claims that "sound" in securities fraud.  *See Fernandez v. UBS AG*, 222 F. Supp. 3d 358, 385 (S.D.N.Y. 2016) ("Puerto Rico courts have interpreted [PRUSA's time bar] more broadly to preclude plaintiffs from bringing claims that sound in securities fraud, even when those claims are brought pursuant to a common law theory"); *see also Ambert v. Caribe Equity Grp., Inc.*, Civil No. 11-1254, 2011 WL 4626012, at *7 (D.P.R. Sept. 30, 2011) (holding that PRUSA extinguishes any claims for fraud under Commonwealth law brought more than two years after the sale contract has been executed); *PaineWebber, Inc. v. First Bos., Inc.*, 136 D.P.R. 541, 548 (1994) (affirming dismissal of breach of contract claim brought after expiration of PRUSA's two-year period because the claim sounded in securities fraud).[18]

Here, all of Plaintiffs' Commonwealth Law claims, regardless of whether they are styled as "fault," "recklessness" or "negligence," unmistakably sound in securities fraud because the same exact allegations are the lynchpin for the federal securities claims – *i.e.*, the allegedly fraudulent sale of securities.  *See, e.g.*, TAC ¶ 168 (". . . it was the Defendant's professional responsibility and it had a fiduciary duty to disclose to the Plaintiffs and putative Class members all facts that were material *for their decision to purchase the PR securities*.") (emphasis added); *see also Fernandez*, 222 F. Supp. 3d at 385 (explaining that "courts analyzing whether claims sound in fraud look to whether fraud or deception is a necessary component of that claim" and cautioning courts to "be wary of artful pleading" because, "regardless of a plaintiff's

---

[18]     This Puerto Rico Supreme Court opinion is reported in its original Spanish language. In accordance with Local Rule 5(g), we attach as Exhibit 23 a certified translation of the opinion.

characterization of a claim" as based on a non-fraudulent theory, they "must examine whether fraud is nonetheless an essential part of the plaintiff's theory.") (citations omitted); *Xpedior Creditor Tr. v. Credit Suisse First Bos. (USA) Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004) ("A claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim.").

Accordingly, because the Commonwealth Law claims in the TAC pertain to securities transactions executed between December 2012 and October 2013 (*i.e.*, at least **four years** prior to the commencement of this action), and because each of those causes of action obviously sounds in securities fraud, the claims are barred by PRUSA's two-year statute of repose and must be dismissed as untimely.[19]

---

[19]     Plaintiffs attempt to save their untimely claims by raising the doctrine of equitable tolling. *See* TAC ¶¶ 143-48. The law is clear, however, that equitable tolling does not apply to statutes of repose. *See Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2049, 2052 (2017) (holding that "the object of a statute of repose . . . supersedes the application of a tolling rule based in equity" and explaining that, unlike statutes of limitations – which are "designed to encourage plaintiffs to pursue diligent prosecution of known claims" – statutes of repose "effect a legislative judgment that a defendant should be free from liability after the legislatively determined period of time.") (quotation omitted).

Equitable tolling principles in any event fail to save Plaintiffs' claims from the two-year statute of limitations because "when a limitations period is tolled because of fraudulent concealment of facts, the tolling ceases when those facts are, or should have been, discovered by the plaintiff." *Credit Suisse Sec. (USA) LLC v. Simmonds*, 566 U.S. 221, 227 (2012) (citation omitted). As the TAC itself demonstrates (*see, e.g.*, ¶ 72), Plaintiffs were well aware of the facts underlying their claims – *i.e.*, the decline in the Puerto Rico bond market – by at least August 2013. Nor does equitable tolling affect Plaintiffs' Commonwealth Law claims. Under Puerto Rico law, equitable tolling is only available when a defendant "willfully and wrongfully (*dolosamente*) concealed material information within the limitations period." *Diaz v. Rivera*, 217 F. Supp. 3d 464, 469 (D.P.R. 2016) (quotation omitted). Here, Plaintiffs do not even attempt to plead a conscious intent to fraudulently conceal facts giving rise to the claims asserted. (*See* Part II.A.2, *infra*.) Plaintiffs cannot exploit the doctrine of equitable tolling to revive their untimely claims.

## II.    PLAINTIFFS' FEDERAL SECURITIES LAW CLAIMS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM

Even if Plaintiffs' claims were not time-barred, dismissal with prejudice still would be appropriate here because the TAC fails to plead sufficiently any claim.  Under FRCP 12(b)(6), a complaint must "contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *S.E.C. v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  This burden is unmet where, as here, a plaintiff's allegations are "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Id*.  Moreover, because Plaintiffs' claims here are based on allegations of fraud, they also must meet the heightened pleading standards articulated in FRCP 9(b) and the PSLRA. *See ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008).  To satisfy Rule 9(b), a plaintiff must "(1) specify the statements that [it] contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1st Cir. 1997) (quotation omitted). The PSLRA expanded on this standard, requiring that securities fraud complaints "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief . . . state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(l); *see also Powers v. Bos. Cooper Corp.*, 926 F.2d 109, 111 (1st Cir. 1991) (holding that securities fraud plaintiffs must "specify[] in the . . . complaint the time, place, and content of the alleged false or fraudulent representations.") (citation omitted).

As demonstrated below, the TAC fails to meet these stringent requirements.  In fact, review of the pleading with these principles in mind reveals that Plaintiffs have failed to plead nearly *each and every* element of an Exchange Act claim.  Moreover, with respect to the claim

for violation of Section 17(a) of the Securities Act, the TAC betrays a fundamental misunderstanding of the federal securities laws:  it is well settled that Section 17(a) does not create any private right of action.

### A.   The Complaint Does Not Sufficiently State a Claim Under Exchange Act Section 10(b) and Rule 10b-5

To state a claim for violation of Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must plausibly allege the following elements:  "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc*., 537 F.3d 35, 44 (1st Cir. 2008) (citations omitted).  The following subsections establish that Plaintiffs have not come close to adequately pleading the necessary elements of their claim, namely an actionable material misrepresentation or omission, scienter, or loss causation.

### 1.   The Complaint Fails to Plead an Actionable Material Misrepresentation or Omission

The TAC does not identify any alleged misstatement.  Indeed, there is not a single allegation that any Santander entity or officer at any time made any statement in connection with the purchase or sale of any security that was false or misleading at the time the statement was made.  *See also*, *e.g.*, TAC ¶ 154 (premising Plaintiffs' Exchange Act claims only on allegedly omitted facts).

Plaintiffs' Section 10(b) claim, therefore, rests exclusively on an omission theory of liability.  Omissions, however, are actionable only if *material*, meaning there is "a substantial likelihood" that a reasonable investor would have viewed its disclosure "as having significantly altered the 'total mix' of information" available when he or she made the investment.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S.

224, 231-32 (1988)); *see also* 17 C.F.R. § 240.10b-5.  Moreover, because "there can be no fraud

absent a duty to speak," omissions are only actionable if they involve information that the

defendant had a legal duty to disclose.  *Cent. Bank of Denver, N.A. v. First Interstate Bank of*

*Denver, N.A.*, 511 U.S. 164, 174 (1994) (quotation omitted); *see also In re Cabletron Sys., Inc.*,

311 F.3d 11, 36 (1st Cir. 2002) ("[A] company need not reveal every piece of information that

affects anything said before," but only has a duty to "disclose facts, 'if any, that are needed so

that what was revealed [before] would not be so incomplete as to mislead.'") (quoting *Backman*

*v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc)).

Notwithstanding Plaintiffs' attempt to tell a salacious tale of a "scheme to defraud"

(TAC ¶ 2), their Section 10(b) claim boils down to three categories of alleged omissions:

> (i)   omitted information regarding the health of the Puerto Rico economy and the
>       securities' exposure to price fluctuation caused by the economy (*see* TAC ¶
>       104(a), (b), (e), (n));
>
> (ii)  omitted information about Defendants' view of the economy and related risks of
>       owning the Purchased Securities (*see id.* ¶ 104(c), (f)); and
>
> (iii) omitted information about Defendants' proprietary in-house positions (meaning,
>       the extent to which SSLLC held certain of the securities in its own firm inventory)
>       (*see id.* ¶ 104(d), (g)-(m), (o)).

None of the allegations in any of these categories is actionable because all of these facts

were either disclosed (in the offering documents or via other publicly available sources) or were

not subject to any legal duty to disclose.

### a.   The Allegedly Omitted Risks Related to Investing in the Puerto Rico Economy Were, In Fact, Disclosed

Plaintiffs assert that they were misled about the risks associated with investing in the

Puerto Rico economy and that Defendants concealed information about those risks, but these

allegations are squarely refuted by the disclosures for the Purchased Securities, as well as several

21

other public documents that are *referenced in the TAC*.  For instance, Plaintiffs allege that

Defendants "omitted and concealed" that "on December 13, 2012, Moody's downgraded the

Puerto Rico's [sic] General Obligation Bonds (GOBs) and related debt to Baa3" (TAC ¶ 104(e)),

but elsewhere in the pleading Plaintiffs acknowledge the public announcement of this very same

event.  *See* TAC ¶ 72.  The law is clear that Section 10(b) claims cannot be "predicated on the

concealment of information if that information was, in fact, disclosed."  *In re The First*

*Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 155 (D. Mass. 2009); *see also In re Merrill*

*Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 250, 261, 265 (S.D.N.Y. 2003)

(dismissing securities claims based on publicly available information because plaintiffs should

have been aware of facts they claimed were not disclosed).

Obvious examples of this fundamental and fatal defect in the TAC abound.  Indeed, all of

the purportedly omitted risks of investing in the Puerto Rico economy were actually disclosed in

the offering materials for the Purchased Securities or were otherwise publicly available and

generally known:

| Alleged Omissions | Example Disclosures |
|---|---|
| "The events or circumstances in the PR economy that lead [sic] to changed increased risks in the market of the PRMBs."  (TAC ¶ 104(a)) | • ". . . **The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006**.  For more information regarding the economic conditions of the Commonwealth, see *Appendix A – Commonwealth Economic Information* . . . ." (Ex. 1 (COFINA Bond Prospectus) at 29 (emphasis added).)<br><br>• "On August 8, 2011, **Moody's Investors Service** ('Moody's') **lowered its rating on the Commonwealth unenhanced general obligation bonds to 'Baa1' with a negative outlook** from 'A3' . . . the **downgrade reflects the continued financial deterioration of the severely underfunded retirement systems, continued weak economic trend, and weak finances** . . . ."  (Ex. 7 (Commonwealth of Puerto Rico, *Supplement to Annual Financial Information—Fiscal Year 2011* (Apr. 30, 2012)) at 13 (emphasis added).) |

| Alleged Omissions | Example Disclosures |
|---|---|
| | • "The downgrades reflect our view of the **increased risk in the bonds' escalating debt service structure** as a **result of** the effects on Puerto Rico's economy of the **extended recession coupled with structural changes in the manufacturing sector due to the phase-out of territorial tax benefits and exposure to greater global competitive forces.** The combined result is that **the commonwealth's economy is expected to underperform** compared to the US economy . . . ." (Ex. 12 (July 19, 2012 Investor Disclosure concerning Moody's July 18, 2012 Rating Downgrade) at 3 (emphasis added).)<br><br>• "**Economic growth prospects remain weak** after six years of recession and **could be further dampened** by the commonwealth's efforts to control spending and reform its retirement system . . . The **lack of significant economic growth drivers and the commonwealth's declining population have also reduced prospects for a strong economic recovery**. . . .<br><br>Puerto Rico . . . **is** still essentially a weak economy that is **not likely to be able to absorb much additional stress** . . . [because it] lacks clear growth drivers as its manufacturing sector continues to see employment reductions . . . .<br><br>[T]he **projected deficit** for the fiscal year ending June 30th **will grow.**" (Ex. 13 (December 14, 2012 Investor Disclosure concerning Moody's December 13, 2012 Rating Downgrade) at 3-5 (emphasis added).) |
| "The nature of the economic risks exposure that the purchase of PRMBs created." (TAC ¶ 104(b)) | • "Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Offered Bonds as well as other information contained in this Official Statement . . . **Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Offered Bonds** . . . ." (Ex. 1 (COFINA Bond Prospectus) at 29 (emphasis added).)<br><br>Also, with respect to the PRCEFs:<br><br>• "The value of the shares of the Fund will depend on the **value of the underlying investments held by the Fund which will fluctuate with general market and economic conditions** and other factors which may be beyond the control of the Fund." (Ex. 4 (Tarsan II Fund Prospectus) at cover 2 (emphasis added).) |

| Alleged Omissions | Example Disclosures |
|---|---|
| | • "Stock prices fluctuate.  Apart from the risks identified below, the **Fund's investments may be negatively affected by the broad investment environment in the U.S., Puerto Rico and international securities markets**, which may be influenced by, among other things, interest rates, inflation, politics, fiscal policy and current events.  Therefore, as with any Fund that invests in securities, the Fund's net asset value will fluctuate.  **You may experience a decline in the value of your investment and could lose money.**"  (*Id.* at 6 (emphasis added).)<br><br>• "Risks of Puerto Rico Obligations. . . .  Investment by the Fund in Puerto Rico securities is subject to their availability in the open market.  **There is presently a limited number of participants in the market for certain Puerto Rico obligations.  In addition, Puerto Rico debt obligations may have periods of illiquidity**.  These factors may affect the Fund's ability to acquire or dispose of such securities, as well as the price paid or received upon such purchase or sale by the Fund."  (*Id.* at 9 (emphasis added).) |
| "That on December 13, 2012, Moody's downgraded the Puerto Rico's [sic] General Obligation Bonds (GOBs) and related debt to Baa3, one step above junk-bond status."  (TAC ¶ 104(e))<br><br>"That the Moody's downgrade of the GOBs further increased SSLLC's concerns to [sic] the risk exposure of the PRMBs."  (TAC ¶ 104(f)) | • **"Moody's downgrades Puerto Rico general obligation and related bonds to Baa3 from Baa1 . . . ."** (Ex. 13 (December 14, 2012 Investor Disclosure concerning Moody's December 13, 2012 Rating Downgrade) at 3.)<br><br>• **"Moody's Investors Service** has **downgraded the general obligation rating of the Commonwealth of Puerto Rico to Baa3 from Baa1**.  The downgrade also applies to those ratings that are based on or capped at the G.O. rating of the commonwealth (see list later in the report). **The outlook is negative.**" (*Rating Action: Moody's Downgrades Puerto Rico General Obligation and Related Bonds to Baa3 from Baa1 and Certain Notched Bonds to Ba1*, MOODY'S INVESTORS SERVICE (Dec. 13, 2012), https://www.moodys.com/research/Moodys-downgrades-Puerto-Rico-general-obligation-and-related-bonds-to--PR_262231) (emphasis added).) |
| "That the information about the risks that the PRMBs' [sic] entailed was also highly relevant to the purchases and sales | • "The Fund will invest primarily in fixed-income tax-exempt securities including Puerto Rico and U.S. Government securities, mortgage-backed and asset-backed securities and municipal obligations.  **Normally, at least 67% of the Fund's asset[s] must be invested in Puerto Rico securities . . . The** |

| Alleged Omissions | Example Disclosures |
|---|---|
| of the PRCEFs and PROEFs because they are heavily concentrated (over 67%) and leveraged (doubling the concentration to over 134%) in PRMBs." (TAC ¶ 104(n)) | **Fund may** issue preferred stock and debt securities, and **engage in other forms of leverage** to increase amounts available for investment."  (Ex. 4 (Tarsan II Fund Prospectus) at cover 1 (emphasis added).)<br><br>• "Geographical Risk:  **The Fund intends to invest 67% of its portfolio in Puerto Rico obligations**.  As a result, the Fund will be less diversified geographically than a fund investing across many states and therefore **has greater exposure to adverse economic and political changes in Puerto Rico.**" (*Id.* at 7 (emphasis added).)<br><br>• "While the **use of leverage** provides the opportunity for increased net income, it **can create special risks, including higher volatility of the net asset value and the market value of the shares of the Fund**.  See 'Risk Factors and Special Considerations of Leverage' on page 18." (*Id.* at cover 1 (emphasis added).)<br><br>• "The Fund may increase amounts available for investment through the issuance of preferred stock or debt securities, or engage in other forms of leverage . . . .<br><br>*Risks* . . . **Use of leverage** . . . **is a speculative investment technique and involves increased risk for shareholders** to a greater extent than in a non-leveraged fund, including the possibility of higher volatility of both the net asset value and the market value of the shares.  The effects of leverage **may cause a shareholder to lose any or all of the amount invested in the shares.**" (*Id.* at Prospectus Summary, 2 (emphasis added).)<br><br>• "The net asset value of the Fund's shares of common stock will fluctuate with interest rate changes as well as with price changes of the Fund's portfolio securities, and these **fluctuations are likely to be greater in the case of a fund having a leveraged capital structure, as contemplated for the Fund.**  An investment in the Fund is **suitable only for investors who can bear the risks associated with the limited liquidity** of the shares." (*Id.* at 6 (emphasis added).) |

These disclosures make clear that the risks relating to events in the Puerto Rico economy, and concentrated and leveraged investments in Puerto Rico securities, were not omitted.  And, to state the obvious, a Section 10(b) claim predicated on omissions is groundless if none of the allegedly omitted information was concealed.

        **b.**      **Alleged Omissions Related to Santander's Inventory Are Not Actionable and, in Any Event, Investors Were Warned of the Risks that Occurred**

Plaintiffs' remaining omission allegations pertain to Santander's reduction of its PRMB inventory in late 2012 and into 2013.  *See, e.g.*, TAC ¶¶ 104(c) (SSLLC "omitted and concealed" its "concern about the risk caused by owning any PRMBs"); 3 (SSLLC "omitted and concealed . . . [that it] was selling all its inventory of PRMB [sic] and reducing its inventory of PRCEFs."); 86 ("Starting in or around November 29, 2012, SSLLC, acting in concert with the other Santander Defendants, began reducing its PRMBs inventory.").  These allegations do not suffice to plead an Exchange Act claim because the law is clear that to be actionable, an omission must both be material *and* violate a legal duty to speak.  Neither is true here.

*First*, Santander had no legal duty to disclose its proprietary PRMB inventory positions.  Nor can Plaintiffs allege any such duty.  Under federal law, a duty to speak only arises when a defendant has published relevant research or made a previous misleading statement.  *See Matrixx*, 563 U.S. at 44-45 (holding that disclosure is required under Section 10(b) and Rule 10b-5 "only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading" and noting that, "[e]ven with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market.") (internal quotation omitted); *see also Chiarella v. United States*, 445 U.S. 222, 235 (1980) (holding that "a duty to disclose

under §10(b) does not arise from the mere possession of nonpublic market information.");

*Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996) ("The federal securities

laws impose no obligation upon an issuer to disclose forward-looking information such as

internal projections, estimates of future performance, forecasts, budgets, and similar data.")

(quotation omitted).  Because Plaintiffs do not allege (because they cannot) that SSLLC as a firm

issued research or expressed public views concerning investments, or made any public

statements concerning its inventory positions, SSLLC did not have a legal duty to disclose that

information as it changed.

Indeed, courts that have addressed virtually identical scenarios have consistently

dismissed claims premised on similar omission allegations.  *See, e.g.*, *In re GAP Sec. Litig.*, No.

89-16098, 1991 WL 17091 at *3-4 (9th Cir. Feb. 8, 1991) (dismissing section 10(b) claim upon

finding defendant had no duty to disclose changing inventory levels because it had not made any

previous affirmative statements about those levels); *Wilson v. Merrill Lynch & Co.*, 671 F.3d

120, 135 (2d Cir. 2011) (rejecting section 10(b) liability because the defendant did not need to

disclose its purported motive for "meet[ing] certain limits on its own inventory" or "its internal

assessment that the ARS market was collapsing.").  Departing from this precedent would upend

industry practice by allowing a securities claim any time a financial institution does not disclose

its internal positions, even when that institution did not otherwise publish research or disclose its

opinion regarding those positions.

*Second*, Plaintiffs do not allege – and cannot allege – that SSLLC's inventory of PRMBs

and its disposition of any portions of that inventory affected the market value of the PRMBs.

Moreover, Plaintiffs allege no basis to conclude that SSLLC's reasons for holding an asset are

correlated with the reasons its customers might buy, hold, or sell any given security.  For

instance, holding Puerto Rico municipal bonds in inventory exposes Santander to short-term price volatility that can affect its risk position limits as a regulated broker-dealer.  By contrast, Santander's Puerto Rico customers generally are long-term investors who seek income and tax benefits by continuing to hold Puerto Rico municipal bonds to maturity.

In sum, the information that Plaintiffs allege was not disclosed simply is not actionable as a matter of law because it involves proprietary business matters about which there is no legal duty to speak.  Moreover, as discussed below, even if this Court were to conclude that Plaintiffs' allegations are actionable, Santander unmistakably *did* warn investors in the Purchased Securities that Santander had no obligation to maintain a market for these investments (*i.e.*, maintain inventory so customers could readily purchase those securities).  Indeed, Santander expressly warned that it might stop maintaining that market at any time, disclosing among other things that:

> (1) Santander might reduce or stop maintaining its PRMB inventory at any time;
>
> (2) its decision to cease creating a market for PRMBs could render those shares illiquid;
>
> (3) it had no obligation to repurchase PRMBs from customers and that repurchase was in fact not guaranteed, particularly upon the occurrence of events that evidence lack of liquidity; and
>
> (4) it would earn fees from the investments.

As outlined in the following table, the prospectuses for the Purchased Securities disclosed *precisely* the same risks associated with SSLLC's inventory that Plaintiffs now allege were fraudulently omitted and/or concealed from them.

| Alleged Omissions | Example Disclosures |
|---|---|
| "[T]hat starting in or around November 29, 2012, SSLLC began | • "There is no Assurance that a Secondary Market for the Offered Bonds will Develop.  The Offered Bonds are a new issue of securities.  There is no assurance that a secondary |

reducing its PRMBs inventory because of the foregoing risks." (TAC ¶ 104(d)).

"That, on December 14, 2012, SSLLC closed its Puerto Rico trading desk to any new purchases of PRMBs." (TAC ¶ 104(i)).

"That SSLLC's stop of purchase [sic] of PRMBs could reduce the liquidity of the PRMBs." (TAC ¶ 104(k)).

"That after December 14, 2012 SSLLC stopped purchasing PRMBs that its customers sought to sell." (TAC ¶ 104(j)).

market for the Offered Bonds will develop, or if it does develop, that it will provide the holders of the Offered Bonds with liquidity for their investment or that it will continue for the life of the Offered Bonds.  Although the Underwriters have advised the Corporation that they presently intend to make a market for the Offered Bonds . . . the Underwriters are not obligated to do so and **any such market making may be discontinued at any time at the sole discretion of the Underwriters**."  (Ex. 1 (COFINA Bond Prospectus) at 32 (emphasis added).)

Also, with respect to the PRCEFs:

- "Closed-End Fund, **Limited Liquidity**, Unlisted . . . . Prior to this offering there has been no market for the shares.  Santander Securities intends to maintain a market in the shares after the completion of the final closing, although it is not obligated to do so.  **No assurance can be given as to the liquidity of, or the trading market for, the shares as a result of any such activities undertaken by Santander Securities**.  Any efforts to maintain a market in the shares, if commenced, may be discontinued at any time.  **If at any time Santander Securities is the only market maker in the shares, and ceases to maintain a market, the shares will become illiquid until a market is reestablished**.  The Fund's shares, therefore, may not be readily marketable . . . ."  (Ex. 4 (Tarsan II Prospectus) at 6 (emphasis added).)

- "Valuation of Fund Assets, Illiquid Securities . . . . There is no limitation on the Fund's ability to invest in illiquid securities . . .  **The Fund may not be able readily to dispose of illiquid securities at an amount that approximates that at which the Fund has valued them**, and might have to sell other investments if necessary to raise cash to meet its obligations.  Moreover, depending on the level of the Fund's investments in illiquid securities, the **Fund may be unable to meet those obligations**, which could have additional adverse consequences to the Fund and its shareholders . . . ."  (*Id.* at 9 (emphasis added).)

- "Repurchase of shares by Fund . . . . Upon the occurrence of certain events that evidence lack of liquidity of the shares, the Fund intends to provide a **limited degree** of liquidity to shareholders by making, from time to time, offers to repurchase the shares at the then-current net asset value . . .  **Repurchase is not guaranteed**, however, and to the extent that the number of shares tendered by shareholders for repurchase exceeds the

| | number of shares available for repurchase for that quarter, repurchase will be made on a pro-rata basis."  (*Id.* at Prospectus Summary, 4 (emphasis added).) |
|---|---|
| "[SSLLC's] conflicted interest in soliciting [Plaintiffs] to purchase the PR securities."  (TAC ¶ 104(o)). | • "Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations.  **Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.**"  (Ex. 1 (COFINA Bond Prospectus) at 43 (emphasis added).)<br><br>Also, with respect to the PRCEFs:<br><br>• "The Fund may enter into various types of transactions with affiliated parties as described in this prospectus.  All transactions with affiliates will be subject to procedures adopted by the Board of Directors and, particularly, the independent Directors of the Board, in an effort to address potential conflicts of interest.  There is no assurance that the procedures will be effective."  (Ex. 4 (Tarsan II Prospectus) at 4.)<br><br>• "Investors will bear certain costs, directly or indirectly, related to various matters, including sales load, investment advisory fees, administration fees and other Fund operating expenses . . . ."  (*Id.* at cover 2.)<br><br>• "Investment advisory fees, which are indirectly paid entirely by shareholders, and administration fees, will be charged as a percentage of average weekly net assets . . . ."  (*Id.* at 5.) |

Accordingly, the Exchange Act claims must be dismissed because Plaintiffs fail to plausibly allege that Defendants made any material misstatement or omission and, in fact, the allegedly omitted or "concealed" facts were:  (i) facts that were readily disclosed to investors or (ii) *not* matters that SSLLC had a legal duty to disclose.[20]

---

[20]    The "material facts" underlying the TAC's alleged "Scheme to Defraud" are taken from the October 13, 2015 Letter of Acceptance, Waiver and Consent entered into between FINRA and SSLLC (the "AWC"), a regulatory settlement pertaining to certain broker-dealer customer

## 2.    The Complaint Fails to Plead Scienter

Plaintiffs' Section 10(b) claim also must be dismissed because the TAC fails to allege

with particularity any facts creating a strong inference of scienter, "a mental state embracing

intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S.

308, 319 (2007).  To draw a sufficient inference of scienter, a complaint must demonstrate that

the defendant acted with a "conscious intent to defraud or 'a high degree of recklessness.'" *ACA*

*Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 58 (1st Cir. 2008) (quoting *Aldridge v. A.T. Cross*

*Corp.*, 284 F.3d 72, 82 (1st Cir. 2002)).  "[T]he pleading of scienter may not rest on a bare

inference that a defendant *must have* had knowledge of the facts." *Maldonado v. Dominguez*,

137 F.3d 1, 9 (1st Cir. 1998) (emphasis added) (internal quotation omitted).  Moreover, scienter

allegations must be "more than merely plausible or reasonable" and can survive dismissal "only

if a reasonable person would deem the inference of scienter cogent and at least as compelling as

any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 314, 324.

The PSLRA imposes additional demands on a plaintiff alleging misstatements or

omissions in violation of Section 10(b), requiring it to plead specific facts "with respect to each

act or omission alleged to violate" the statute.  15 U.S.C. § 78u-4(b)(2)(A); *see also In re Ariad*

*Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 751 (1st Cir. 2016) (holding that scienter cannot be found

---

accounts.  *See, e.g.*, TAC ¶ 96.  But Plaintiffs' reliance on the AWC to buttress their deficient
pleading is improper and should be rejected by the Court because, among other reasons, the letter
did not result from any conclusive fact finding process.  *See In re Merrill Lynch & Co. Research*
*Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (emphasizing that "references to
preliminary steps in litigations and administrative proceedings that did not result in an
adjudication on the merits or legal or permissible findings of fact are, as a matter of law,
immaterial under Rule 12(f) of the Federal Rules of Civil Procedure.") (citing *Lipsky v.*
*Commonwealth United Corp.*, 551 F.2d 887, 892-93 (2d Cir. 1976) (holding that plaintiffs may
not cite unadjudicated findings by a federal agency in their pleadings).

where complaint fails to plead "any specific facts about when the defendants learned of the[ ] adverse events or even when the adverse events occurred.").

Here, Plaintiffs' allegations fall woefully short of creating *any* inference of scienter, let alone one that is cogent or compelling.  Plaintiffs' only scienter-related allegations rest exclusively on bare assertions that Santander was motivated to craft a "scheme" in order to generate fees.  *See* TAC ¶¶ 67 ("Throughout the years, SSLLC together with the other Santander Defendants have earned enormous income from the foregoing commercial transactions . . . ."); 68 ("At the relevant times, all the Santander Defendants have earned, directly or indirectly, substantial income in the underwriting and dale [sic] of the PRMBs, in the creation, and management of the proprietary PRCEFs and PROEFs, in the sales of their shares, and in granting margin or line of credit loans backed with those securities.").

Similar allegations regarding a bare desire to earn fees, however, are routinely rejected because they are insufficient as a matter of law to create a strong inference of scienter.  For example, in *Ezra Charitable Trust v. Tyco Int'l, Ltd.*, the First Circuit affirmed the dismissal of a Section 10(b) claim because the defendants' alleged motivation to continue earning lucrative fees was insufficient to establish a strong inference of scienter.  466 F.3d 1, 13 (1st Cir. 2006) (holding that an entity's "motivation to continue a profitable business relationship is not sufficient by itself to support a strong inference of scienter.") (quotation omitted).  Likewise, the First Circuit recently reiterated that "catch-all allegations that defendants stood to benefit from wrongdoing are not enough" to establish scienter, and explained that satisfying Section 10(b)'s pleading standard requires "allegations that 'the very survival of [defendant's] company w[as] on the line' " or that it "would shutter its doors unless it padded earnings by deceiving investors." *Kader v. Sarepta Therapeutics*, *Inc.*, 887 F.3d 48, 60 (1st Cir. 2018) (quotations omitted)

(affirming dismissal of Section 10(b) and Rule 10b-5 claims); *see also In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 215 (1st Cir. 2005) (same); *Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 81 (D. Mass. 2005) ("Allegations of opportunity and motive, without more, are insufficient at the pleading stage to satisfy the requirements of the PSLRA") (citing *Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir. 2001)).

Santander's alleged fraudulent scheme to generate fees also fails to support an inference of scienter because, as outlined above, the offering documents for the Purchased Securities expressly informed potential investors that certain Santander-affiliated entities were involved in the creation of the securities and would earn fees for that work (*see* Part II.A.1.b, *supra*). These forthright disclosures undermine the TAC's theory of purposeful and fraudulent omission. *See In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 163 (D. Mass. 2009) (finding that "Lead Plaintiffs [] failed to plead sufficient facts giving rise to a strong inference of scienter because [Defendants] disclosed that which the Complaint alleges [they] concealed."). For example, the cover page of the Tarsan II Fund prospectus explicitly stated that "[i]nvestors will bear certain costs, directly or indirectly, related to various matters, including sales load, investment advisory fees, administration fees and other Fund operating expenses . . . ." *See* Ex. 4 (Tarsan II Fund Prospectus) at cover 2; *see also* example disclosures at Part II.A.1.b, *supra*.

In sum, rather than alleging any specific facts establishing scienter with respect to each of the alleged omissions (*see* TAC ¶ 104), Plaintiffs' claims rely entirely on Santander's alleged pursuit of investment fees, a fact that was readily disclosed to investors. Such vague and hollow allegations – the TAC's only scienter allegations – do not come remotely close to sufficiently pleading scienter, and the Exchange Act claims must therefore be dismissed for this independent reason.

3.      **The Complaint Fails to Plead Loss Causation**

Plaintiffs' failure to adequately plead loss causation also independently requires dismissal

of their Section 10(b) claims.  To demonstrate loss causation, a plaintiff must "establish a direct

link between a defendant's misrepresentation and an investor's injury."  *S.E.C. v. Tambone*, 550

F.3d 106, 130 (1st Cir. 2008).  This requires pleading that the defendant company's "share price

fell significantly after the truth became known."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336,

347 (2005).  In other words, Plaintiffs must plead "a plausible theory of stock price inflation . . .

[and] must also allege that the corresponding stock price deflation was caused by a 'corrective

disclosure.' " *Urman v. Novelos Therapeutics, Inc.*, 867 F. Supp. 2d 190, 198 (D. Mass. 2012)

(citation omitted).  Plaintiffs fail to do that here.

a.      **Plaintiffs Cannot Show a Plausible**
**Connection between Their Alleged Losses**
**and Santander's Alleged**
**Misrepresentations or Omissions**

Plaintiffs have not even attempted to establish any direct link between Santander's

alleged omissions and their economic losses.  Instead, in a section purportedly establishing "loss

causation," Plaintiffs merely offer the conclusory allegation that Santander's supposed omissions

"were a proximate cause of the market crash of the PR securities and [Plaintiffs'] economic

losses."  TAC ¶¶ 106-10.  This baseless and nonsensical accusation does not suffice to allege

loss causation, as it falls far short of pleading "what the causal connection might be between

th[e] loss and the [alleged] misrepresentation."  *Dura*, 544 U.S. at 347.   The TAC does not once

attempt to explain how the alleged omissions could have artificially inflated the value of the

PRMBs or PRCEFs, nor how the eventual exposure of those concealed facts could have caused

the Puerto Rico economic crisis.

###### b.   Plaintiffs Have Failed to Distinguish Their Losses from Adverse Market Conditions

Even if one were to accept that Santander's purported omissions were somehow connected to a decline in the value of the Purchased Securities, Plaintiffs' allegations would still fall short of the standard for pleading loss causation because Plaintiffs fail to distinguish their losses from adverse market conditions.

In addition to establishing a causal connection between their losses and a defendant's alleged misrepresentations or omissions, plaintiffs seeking to plead loss causation must untangle any intervening factors "which taken separately or together account for some or all of" those losses, such as "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts."  *Dura*, 544 U.S. at 343; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812-13 (2011) (same).  Courts routinely dismiss securities complaints that fail to distinguish a plaintiff's losses from changed economic circumstances. *See, e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005) (affirming dismissal of Section 10(b) claim for failure to plead loss causation because, "when the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events.") (quotations omitted);  *In re The First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 165 (D. Mass. 2009) (dismissing Section 10(b) claim upon finding that "the deterioration in the credit markets . . . negate[d] Lead Plaintiffs' theory of loss causation.").

Here, Plaintiffs have not plead *any* facts indicating their losses were caused by Defendants' alleged omissions, as opposed to the intervening deterioration of the Puerto Rico

economy.  Coupled with their failure to establish a causal connection between their losses and

the alleged omissions, this shortcoming provides yet another ground for dismissal.

> **B.      There Is No Private Right of Action Under Section 17(a)
> of the Securities Act**

Plaintiffs' Section 17(a) claim is improper and must be dismissed because that provision

of the Securities Act does not allow for a private right of action.  Congress created an explicit

private remedy only for Sections 11 and 12 of the Securities Act.  *See* 15 U.S.C. §§ 77a et seq.

The First Circuit (and every other Circuit Court to rule on the issue) has expressly declined to

recognize a private right of action under Section 17 of the Securities Act.  *See Maldonado v.

Dominguez*, 137 F.3d 1, 7-8 (1st Cir. 1998) (holding that only law enforcement agencies can

assert a claim for violation of Section 17(a) and dismissing claim).  Accordingly, pursuant to

clear statutory interpretation and controlling precedent, the Court must dismiss Plaintiffs' Section

17(a) claim as a matter of law.

> **III.     PLAINTIFFS' COMMONWEALTH LAW CLAIMS MUST
> BE DISMISSED FOR FAILURE TO STATE A CLAIM**

In addition to their federal securities law claims, Plaintiffs assert vague claims labeled as

fraud, deceit, fault, recklessness and/or negligence.  *See* TAC ¶¶ 166-73.  But just like the federal

claims, these Commonwealth Law claims are inapt and/or not properly pled and must be

dismissed.

As an initial matter, as discussed above (*see* Part I.B, *supra*), these claims are time-barred

pursuant to PRUSA's two-year statute of repose.  Moreover, these causes of action are subject to

Rule 9(b)'s heightened pleading standards because they "sound in fraud" (*see* Part I.B, *supra*),

and therefore must be dismissed for the same reasons as the federal securities fraud claims.  *See

Alt. Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir.  2004) (holding that

misrepresentation is considered a species of fraud and that cases alleging fraud "explicitly require" plaintiffs to plead the circumstances constituting fraud with particularity).

Even if they were timely or free from the heightened pleading standard of Rule 9(b), these claims still would be subject to dismissal because Plaintiffs simply fail to plead the necessary elements of the causes of action.  For example, Plaintiffs charge Santander with fraud, deceit, fault, recklessness and/or negligence "in fulfilling the contractual and fiduciary obligations" allegedly owed to them.  TAC ¶ 170.  However, Plaintiffs allege no specific facts supporting the "contractual" or "fiduciary" obligation that they claim was breached.  The TAC does not explain with any particularity:  (1) the contract or contracts at issue, (2) the contractual provisions that purportedly were breached, (3) how and when the breach was committed and by whom, whether a Santander entity or officer, or (4) what damages resulted and how.  Any of these failures alone warrants dismissal of the claims under Puerto Rico law.  *See, e.g.*, *Instituto de Educacion Universal, Inc. v. Great Lakes Higher Educ. Corp.*, No. 98-1300, 2001 WL 1636686, at *2 (D.P.R. Sept. 28, 2001) (holding that "[f]ailure to state the details regarding the creation of the contract and its contents is sufficient to dismiss a breach of contract claim.") (citing *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996)), *aff'd* sub nom. *Instituto de Educacion Universal Corp. v. Great Lakes Higher Educ. Guar. Corp.*, 126 F. App'x 1 (1st Cir. 2005).

With respect to their claim that Defendants were negligent or reckless in failing to supervise Santander employees, Plaintiffs have not identified any employees they allege were inadequately supervised or provided any other factual basis for the claim.  *See* TAC ¶ 172.  A successful breach of fiduciary or supervisory duty claim must be laid out through detailed and specific factual assertions, though, rather than in a hollow conclusory manner.  *See Vetter v.*

*Shearson Hayden Stone Inc.*, 481 F. Supp. 64, 65 (S.D.N.Y. 1979) (dismissing complaint on account of plaintiffs' conclusory allegations of failure to supervise); *see also Dist. Bus. Conduct Comm. for Dist. No. 7 v. William A. Lobb*, 2000 WL 1299576, at *5 (N.A.S.D.R. Apr. 6, 2000) (holding that failure to supervise "is determined based on the particular circumstances of each case.") (citations omitted).

Plaintiffs' fraud and deceit claims are similarly deficient.  A party alleging fraud under Puerto Rico law must demonstrate: "(1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud." *Portugues-Santana v. Rekomdiv Int'l*, 657 F.3d 56, 62 (1st Cir. 2011) (quotation omitted).  Likewise, "[d]eceit may be found 'when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made.' " *Dopp v. HTP Corp.*, 947 F.2d 506, 510 (1st Cir. 1991) (quoting P.R. Laws Ann. tit. 31, § 3408 (1968)).  Here, Plaintiffs assert speciously that Santander "incurred in fraud," but – as discussed above (*see* Parts II.A.1-3, *supra*) – they fail to plead any representations that were actually false, any specific intent to defraud, or any reasonable reliance and injury caused by those representations.  And, as demonstrated above (*see* Part II.A.1, *supra*), none of the purportedly omitted facts which Plaintiffs claim "induced" them to purchase the securities are actionable because those facts were either clearly disclosed or not subject to a legal duty to disclose.  Simply put, the "words" and "insidious machinations" necessary to plead a claim for deceit are thus conspicuously absent here.  *See Dopp*, 947 F.2d at 510.

In sum, even viewed in the light most favorable to Plaintiffs, the vague and entirely conclusory allegations in the TAC are woefully insufficient to plead an actionable claim for

fraud, deceit, fault, recklessness or negligence under Puerto Rico law.  Like those asserted

pursuant to federal securities laws, these claims must be dismissed.

### IV.  PLAINTIFFS LACK STANDING TO BRING CLAIMS RELATED TO SECURITIES THAT THEY DID NOT PURCHASE

Plaintiffs purport to assert claims on behalf of "[a]ll persons or entities that purchased

Puerto Rico Municipal Bonds, Puerto Rico Closed End Funds, or Puerto Rico Funds from

[SSLLC]" during the Class Period.  TAC ¶ 116.  As discussed above (Statement of Facts,

Sections A, H, *supra*), those bonds and funds include dozens of unique municipal bonds and

mutual funds.  However, these Plaintiffs collectively purchased a total of only *four* securities (the

Purchased Securities), *three* different PRMBs and *one* PRCEF.[21]  *See* TAC ¶¶ 28, 32, 36.

Under well-settled authority in this Circuit, a plaintiff has standing to pursue *only* claims

regarding securities that are the "direct subject" of the alleged violations.  *See, e.g.*, *In re Ariad*

*Pharm.*, *Inc. Sec. Litig.*, 842 F.3d 744, 755-56 (1st Cir. 2016) (holding that plaintiffs lacked

standing to bring a Securities Act claim because the securities they purchased were not the direct

subject of the alleged violations); *Estate of Soler v. Rodriguez*, 63 F.3d 45, 53 n.8 (1st Cir. 1995)

(discussing district court dismissal of Section 10(b) claims where "plaintiffs lacked standing to

maintain a private action in their individual behalves for securities fraud under Rule 10b-5,

because they did not purchase or sell the securities involved in the disputed transaction")

(reversed on alternate grounds); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 531-32 (S.D.N.Y.

---

[21]     Specifically, Plaintiffs have alleged purchases of the COFINA Bond, The GDB Bond, the PIR Bond, and the Tarsan II Fund (*see* Statement of Facts, Section H, *supra*).  Moreover, despite seeking to represent all purchases of "Open-End Puerto Rico Funds" (*see* TAC ¶ 1), no Plaintiff made any such purchase.  *See id.* ¶¶ 28, 32, 36.

2008) (dismissing claims where "Plaintiffs lack standing for claims relating to funds in which they did not personally invest.").

This is *not* an issue to be dealt with at the class certification stage.  Rather, Plaintiffs' attempt to assert claims concerning securities in which no named plaintiff ever invested is a pleading failure that requires dismissal on a Rule 12(b)(6) motion.  *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010) ("Standing is a threshold constitutional requirement that . . . can not be dispensed with by styling the complaint as a class action."), *aff'd*, 650 F.3d 167 (2d Cir. 2011).  The holding of the District Court for the Southern District of New York in *Hoffman* is particularly instructive.  591 F. Supp. 2d at 532.  In that action, like here, the plaintiffs asserted class action claims against several UBS-affiliated entities that were involved with the creation and sale of various mutual funds.  *See id.* at 527.  The defendants moved to dismiss the complaint as to any mutual fund in which the named plaintiffs did not invest during the proposed class period.  *See id.* at 530.  The plaintiffs argued that the court should "defer[] the standing decision until after the class certification stage" because, among other reasons, they alleged a single course of wrongful conduct and the relevant funds in which they had *not* invested were "substantially identical" to those in which they had.  *Id.* at 531.  The court disagreed, holding that standing was a threshold issue that concerned the court's power to adjudicate the claims in the first instance:  "[i]f a party, such as Plaintiffs in this case, is not personally injured by the alleged action of a defendant then he is not entitled to come into court and litigate that action, regardless of whether the disposition of his case necessarily requires the same result as the case of another.").  *Id.* at 532.

Accordingly, even putting aside the defects addressed above that require dismissal of the TAC in its entirety, *at most* this action could proceed *only* with respect to the four Purchased

Securities in which Plaintiffs personally invested – *i.e.*, the Tarsan II Fund and the COFINA, GDB, and PIR Bonds – and must otherwise be dismissed.

## V.   PLAINTIFFS' CLAIMS AGAINST BSSA MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

Any and all claims against defendant BSSA also must be dismissed pursuant to FRCP 12(b)(2) because Plaintiffs have not established general or specific personal jurisdiction over BSSA, an entity incorporated and located in Spain.  As the Supreme Court has explained, "the place of incorporation and principal place of business" of a corporation "are paradigm bases for general jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 134-35, 137 (2014) (noting that "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction" and rejecting argument that "a foreign corporation may be subjected to a court's general jurisdiction based on the contacts of its in-state subsidiary").  In addition, to assert specific personal jurisdiction a plaintiff must show that "their claim directly arises out of or relates to the defendant's forum-state activities."  *Scottsdale Capital Advisors Corp. v. The Deal, LLC*, 887 F.3d 17, 20 (1st Cir. 2018).  Here, as the TAC alleges, BSSA "is a global financial services company organized under the laws of the Kingdom of Spain with its principal place of business in Madrid, Spain."  TAC ¶ 42.  The TAC pleads no facts suggesting that BSSA – as opposed to certain of its subsidiaries – had *any* Puerto-Rico "forum-state activities" whatsoever.  Accordingly, Independent from any other basis established herein, the Court should dismiss BSSA from this action.

## VI.   PLAINTIFFS' CLAIMS AGAINST BANCORP, SHUSA, BSPR, AND BSSA MUST BE DISMISSED BECAUSE THE TAC FAILS TO PLEAD ANY CONDUCT BY THOSE DEFENDANTS

In addition to SSLLC, the TAC names as defendants Bancorp, SHUSA, BSPR, and BSSA.  *See* TAC ¶¶ 37-44.  Nowhere in the Complaint, however, are there *any* particularized

allegations with respect to any Defendant other than SSLLC.  Indeed, there are no allegations at all about the roles played or any actions taken or statements made by any other Santander entity.  *See, e.g.*, TAC ¶ 45 ("the Santander Defendants acted in concert and are joint tortfeasors in the creation and execution of the Scheme to Defraud").  This is yet another independent basis to dismiss the claims against Bancorp, SHUSA, BSPR, and BSSA.  In addition to the arguments set forth in detail herein, because none of these other entities underwrote the PRMBs or marketed or sold any relevant PRMB, PRCEF, or PROEF to Plaintiffs or any other investors, any claims against Bancorp, SHUSA, BSPR, and BSSA must be dismissed.  *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142-44 (2011) (holding that Rule 10b-5 liability is limited to "the person or entity with ultimate authority over [a false] statement, including its content and whether and how to communicate it."); *see also generally Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365 (5th Cir. 2004) ("Consistent with our rejection of the 'group pleading' doctrine, we do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court dismiss the TAC in its entirety and with prejudice.

Date:  May 28, 2019                   By:   /s/  Néstor M. Méndez Gómez

**PIETRANTONI MENDEZ & ALVAREZ LLC**
Néstor M. Méndez Gómez  (USDC-PR No.: 118409)
Sara L. Vélez Santiago  (USDC-PR No.:  224004)
Jason R. Aguiló Suro  (USDC-PR No.:  227311)
Popular Center, 19th Floor
208 Ponce de Leon Avenue
San Juan, Puerto Rico 00918

Tel: (787) 274-1212
Fax: (787) 274-1470
E-mail:  nmendez@pmalaw.com
      svelez@pmalaw.com
      jaguilo@pmalaw.com

**SIDLEY AUSTIN LLP**
Andrew W. Stern  (*admitted pro hac vice*)
Nicholas P. Crowell  (*admitted pro hac vice*)
James O. Heyworth  (*admitted pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Facsimile:  (212) 839-5599
Email:  astern@sidley.com
      ncrowell@sidley.com
      jheyworth@sidley.com

*Co-Counsel for Defendants Santander Securities, LLC; Santander Bancorp; Santander Holdings USA, Inc.; Banco Santander Puerto Rico; and Banco Santander S.A.*