**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**JORGE PONSA-RABELL,** *et al.*,

Plaintiffs,

v.

**SANTANDER SECURITIES, LLC**, *et al.*,

Defendants.

Civil No. 17-2243 (CCC/BJM)

## REPORT AND RECOMMENDATION

Plaintiffs brought this putative class action against defendants Santander Securities, L.L.C. ("SSLLC"); Santander Bancorp ("Bancorp"); Santander Holdings USA, Inc. ("SHUSA"); Banco Santander Puerto Rico ("BSPR"); and Banco Santander S.A. ("BSSA") (collectively "defendants"). They assert claims under Section 10(b) and Rule 10b-5 of the 1934 Securities Exchange Act, Section 17(a) of the 1933 Securities Act, and Puerto Rico law. Docket No. 45 ("Am. Compl."). Before the court is defendants' joint motion to dismiss pursuant to Rules 9(b), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure. Docket No. ("Dkt.") 49. Plaintiffs opposed, Dkt. 52, defendants replied, Dkt. 57, and plaintiffs submitted a surreply, Dkt. 61. The motion to dismiss was referred to me for a report and recommendation. Dkt. 67.

For the following reasons, defendants' motion should be **GRANTED.**

## BACKGROUND

Unless otherwise specified, the following facts are drawn from the complaint. As with any motion to dismiss, they are taken as true and presented in the light most favorable to plaintiffs, although the same have not been proven at trial.

This case is part of the financial fallout related to Puerto Rico Municipal Bonds ("PRMBs"). Plaintiffs are purchasers of PRMBs and other securities heavily concentrated in PRMBs, including Puerto Rico Closed End Funds (PRCEFs) and Puerto Rico Open End Funds (PROEFs) (collectively "PRMB securities"). Am. Compl. ¶¶ 1, 6. Plaintiffs

purchased these securities from SSLLC from December 1, 2012, to October 31, 2013. *Id.* ¶ 1. During that time, ownership of PRMB securities was risky, and SSLLC was reducing its own PRMB inventory because of that risk. *Id.* ¶¶ 70–72, 84.

Defendants are financial services entities. BSSA is a global financial services company organized under the laws of Spain with its principal place of business in Spain. *Id.* ¶¶ 41–42. Two of its wholly owned subsidiaries, Bancorp and SHUSA, are also defendants. *Id.* Bancorp, part of SHUSA, offers integrated financial services in Puerto Rico. *Id.* ¶ 40. Bancorp is also a financial holding company whose various subsidiaries include BSPR and SSLLC, both of which are also defendants. *Id.* ¶¶ 39–40. BSPR is one of the largest banks in Puerto Rico. *Id.* ¶ 43–44. It acts as the issuing, paying, and transfer agent and administrator and custodian for securities that are highly concentrated in PRMBs. *Id.* ¶ 44. BSPR has earned substantial income from the underwriting and sale of PRMBs and the administration and management of securities concentrated in PRMBs. *Id.* SSLLC is a securities and money management firm and registered broker-dealer. *Id.* ¶¶ 38–39. SSLLC is the dominant market trader of PRMBs. *Id.* ¶ 39. According to plaintiffs, defendants' directorships and upper management substantially overlap, and defendants otherwise disregard corporate distinctions. *Id.* ¶ 46.

Plaintiffs charge defendants with devising a scheme to defraud them, whereby SSLLC, acting in concert with other defendants, solicited plaintiffs to buy PRMBs without revealing certain information regarding the risks involved and SSLLC's internal strategy related to those risks. *Id.* ¶¶ 3, 7, 10, 102.

PRMBs are financial instruments used by the government of Puerto Rico to finance its commercial operations. *Id.* ¶ 47. Generally, buyers of PRMBs loan the issuer money in exchange for a set number of interest payments. Issuers guarantee payment of the monthly yield and principal by a certain maturity date. *Id.* At the time plaintiffs purchased PRMB securities, a series of factors, including Puerto Rico's economic situation, made that investment risky. *Id.* ¶¶ 70–71.

Puerto Rico has experienced an economic recession since 2006. *Id.* ¶ 56. Since that time, public debt has skyrocketed, as the government has met its financial obligations by continuously increasing its sales of PRMBs. *Id.* From 2006 to 2013, Puerto Rico issued around $61 billion in PRMBs. *Id.* ¶ 65. The government of Puerto Rico used the moneys obtained from that debt to pay off existing debt. *Id.* ¶ 66. It did not use that money to revive the economy or alleviate social needs. *Id.* The deficit increased to around $2.2 billion. *Id.* ¶ 71. Meanwhile, the economy was shrinking, and middle-class Puerto Ricans were leaving the island. *Id.* A high percentage of workers were public employees, and many were unemployed. *Id.* Puerto Rico was also experiencing pervasive crime and suffering from inadequate public services. *Id.* Because of Puerto Rico's approach to debt and its precarious economic situation, its debts became unpayable. *Id.* ¶ 67.

In 2012, various sources issued warnings regarding Puerto Rico's precarious economy, growing debt, and the increasing risks associated with PRMB securities. *Id.* ¶ 72. For instance, in March 2012, Breckinridge Capital Advisors warned that Puerto Rico was "flirting with insolvency" and that someday the Commonwealth might be unable to pay its debts. *Id.* On July 27, 2012, a report explained that the creditworthiness of PRMBs was "inextricably intertwined with the fiscal health of the Commonwealth" and called Puerto Rico debt growth "unsustainable." *Id.* The report warned against "[c]oncentrations in Puerto Rico paper exceeding 10% of a portfolio" and advised "investors on the lower end of the risk tolerance scale . . . to target lower concentrations." *Id.* On August 8, 2012, Moody's Investor Service ("Moody's") lowered Puerto Rico's general obligation ("GO") bond credit rating to Baaa1, raised concerns about outstanding government debt, and advised that "[c]onservative investors with concentrated exposure to any single borrower in the municipal market should pursue portfolio diversification." *Id.* On December 13, 2012, Moody's downgraded Puerto Rico's GO credit rating again, from Baa1 to Baa3, just one step above "junk bond" status. *Id.* A credit update issued in February 2013 cautioned that "Puerto Rico's economy continue[d] to struggle with the lingering effects of a

recession, high unemployment, a weakened manufacturing sector, and a significant debt burden." *Id.*

Plaintiffs allege that, given the conditions described above, defendants knew that it was only a matter of time before there would be a substantial decrease in the value of PRMBs. *Id.* ¶¶ 70–71, 82. But defendants also earned substantial income by underwriting, managing, and selling PRMBs. *Id.* ¶ 68.

Defendants had jointly created, controlled, and managed proprietary securities that were highly concentrated in PRMBs. *Id.* These included PRCEFs and PROEFs, which required that 67 percent of the funds' assets be invested in PRMBs. *Id.* ¶ 73. The PRCEFs and PROEFs sold shares of their stock and paid dividends of their profits to their investors after deducting the costs of administration and management. *Id.* ¶ 75. These shares were not PRMB notes but stocks issued by the funds. *Id.* The PRCEFs and PROEFs invested their capital in PRMBs that produced exempt interest income. *Id.* ¶ 73. Dividends paid to shareholders were represented as tax exempt to residents of Puerto Rico. *Id.* According to the prospectus for the funds, their goal was to provide investors "current income consistent with preservation of capital." *Id.* ¶ 74. These funds were highly leveraged, with at least 134% of their capital concentrated in PRMBs. *Id.* ¶¶ 77–78, 80. As of December 2012, these funds were highly concentrated in PRMBs and highly leveraged, making them high-risk investments. *Id.* ¶ 81.

Because SSLLC knew that PRMB securities were risky, it actively sought to rid itself of its PRMB inventory. *Id.* ¶ 84. In September 2012, SSLLC had around $42 million in PRMBs. *Id.* ¶ 85. Starting around November 29, 2012, SSLLC began reducing that inventory. *Id.* ¶ 86. On December 12, 2012, Jonathan Watson, CFA, Director – CCAR PMO at Santander Bank, N.A., reported that the Puerto Rico securities market had experienced a reduction in retail demand and decline in prices across all issuers. *Id.* ¶ 87. On December 13, 2012, after Moody's downgraded Puerto Rico's GO rating to Baa3, SSLLC accelerated efforts to reduce its PRMB inventory because it was concerned about its economic

exposure to the increased risks in the PRMB market. *Id.* ¶ 88. SSLLC's management adopted a "Risk Management Strategy" to reduce PRMB inventory. *Id.* ¶ 89. On December 14, 2012, SSLLC began implementing that strategy and closed its trading desk to any new PRMB purchases. *Id.* ¶ 91. On January 30, 2013, SSLLC adopted a plan that would limit its total exposure to $5 million in PRMBs. *Id.* ¶ 92.

While SSLLC was ridding itself of its own PRMB inventory, it was also selling PRMBs and related securities to plaintiffs. *Id.* ¶ 101. Defendants agreed SSLLC would solicit plaintiffs to purchase the risky securities without disclosing certain facts. *Id.* Their scheme proceeded by one of two routes: SSLLC either instructed its financial advisers to omit certain facts while it was selling PRMBs and related securities, or SSLLC's executives concealed those facts from financial advisors. *Id.*

SSLLC then contacted plaintiffs and other class members and recommended that they purchase the risky securities. *Id.* ¶ 100. Acting on that recommendation, plaintiffs purchased $180 million in PRMBs and $101 million in other PRMB securities. *Id.* ¶¶ 99, 101.

When SSLLC solicited plaintiffs to purchase the PRMB securities, it did not disclose the following:

- The events and circumstances in Puerto Rico's economy that led to increased risk in the PRMB market;
- The nature of the risks involved in purchasing PRMBs;
- SSLLC's concerns about the risks involved in owning PRMBs;
- That SSLLC had begun reducing its PRMB inventory because of the risks involved in owning such inventory;
- That Moody's had downgraded Puerto Rico's GO and related debt rating to Baa3;
- That the Moody's downgrade had further intensified SSLLC's concerns regarding the risks related to PRMBs;

- That SSLLC accelerated its efforts to reduce its inventory of PRMBs as a result of the Moody's downgrade;
- That SSLLC was liquidating its inventory of PRMBs because it considered PRMBs too risky;
- That SSLLC had closed its trading desk to new PRMB purchases and that SSLLC had stopped purchasing PRMBs that its customers sought to sell;
- That SSLLC's decision to cease purchasing PRMBs could reduce their liquidity;
- The reasons why SSLLC was liquidating its PRMB inventory;
- That the risks associated with PRMBs were relevant to the purchase of PRCEFs and PROEFs because they were heavily concentrated and leveraged in PRMBs.

*Id.* ¶ 104.

Shortly before October 2013, the PRMB securities market crashed. *Id.* ¶ 93. At the time of the crash, SSLLC had reduced its PRMB inventory from $ 35 million to $105,000, and it had reduced its inventory of PRCEFs from $9.2 million to $6.8 million. *Id.* The inventory sold was owned or guaranteed, in whole or in part, by some of the other defendants. *Id.*

After purchasing the PRMB securities, plaintiffs sustained severe economic losses. *Id.* ¶¶ 10, 108. They aver that they would not have purchased PRMB securities had SSLLC divulged all the information allegedly omitted. *Id.* ¶ 107 They now seek monetary compensation for their economic losses and ask the court to declare their purchases null and void. *Id.* ¶ 12.

**DISCUSSION**

In their motions to dismiss, defendants raise the following arguments: (1) that the court lacks personal jurisdiction over BSSA; (2) that plaintiffs' claim for violation of

Section 17(a) of the Securities Act fails because that statute does not provide for a private right of action; (3) that plaintiffs' Section 10(b) claim is defective because it fails to plead any of the necessary elements and does not satisfy the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"); (4) that plaintiffs' claims are time-barred; (5) that, if plaintiffs have stated a claim for federal securities fraud, plaintiffs lack standing to raise claims pertaining to securities they did not personally purchase; and (6) that plaintiffs have failed to plead a cause of action under Puerto Rico law. I find that the court lacks personal jurisdiction over BSSA, that plaintiffs' federal claims must be dismissed for failure to state a claim, and that the court should decline to exercise supplemental jurisdiction over any remaining Puerto Rico claims.

## I.     Personal Jurisdiction

Defendants argue the court lacks personal jurisdiction over BSSA, a global financial services company organized under the laws of Spain with its principal place of business in Spain. Plaintiffs counter that BSSA's contacts with the forum are sufficient to permit specific jurisdiction.

When a defendant moves to dismiss per Federal Rule of Civil Procedure 12(b)(2), the plaintiff has "the burden of establishing that jurisdiction over the defendant lies in the forum state." *Baskin–Robbins Franchising LLC* v. *Alpenrose Dairy, Inc.*, 825 F.3d 28, 34 (1st Cir. 2016). To determine whether the "plaintiff has met this burden," the court "may choose from among several methods." *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 50–51 (1st Cir. 2002). The "prima facie" method, which is the most conventional method, "requires no differential factfinding; rather, this method requires only that a plaintiff proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction." *Baskin–Robbins*, 825 F.3d at 34; *see also Boit* v. *Gar-Tec Prod., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992) (prima facie "showing of personal jurisdiction must be based on evidence of specific facts set forth in the record"); *Chlebda v. H.E. Fortna & Bro. Inc.*, 609 F.2d 1022, 1024 (1st Cir. 1979) ("[T]o establish personal

jurisdiction [,] plaintiff must go beyond the pleadings and make affirmative proof."). "For the purpose of examining the merits of such a jurisdictional proffer," the court considers "the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record, giving credence to the plaintiff's version of genuinely contested facts." *Baskin–Robbins*, 825 F.3d at 34. The court will "not credit conclusory allegations or draw farfetched inferences." *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st Cir. 1994). The court may also consider "undisputed facts put forth by the defendant." *Id.*

A plaintiff seeking to establish personal jurisdiction may not "simply surmise the existence of a favorable factual scenario; he must verify the facts alleged through materials of evidentiary quality." *Barrett v. Lombardi*, 239 F.3d 23, 27 (1st Cir. 2001) (citations omitted). "Thus, allegations in a lawyer's brief or legal memorandum are insufficient, even under the relatively relaxed prima facie standard, to establish jurisdictional facts." *Id.*

Here, plaintiffs have failed to allege, let alone point toward competent proof, that BSSA had sufficient contacts with Puerto Rico to permit the court to exercise personal jurisdiction. Plaintiffs seeking to establish specific jurisdiction must demonstrate that

> (1) their claim directly arises out of or relates to the defendant's forum-state activities; (2) the defendant's contacts with the forum state represent a purposeful availment of the privilege of conducting activities in that state, thus invoking the benefits and protections of that state's laws and rendering the defendant's involuntary presence in that state's courts foreseeable; and (3) the exercise of jurisdiction is ultimately reasonable.

*Scottsdale Capital Advisors Corp. v. The Deal, LLC,* 887 F.3d 17, 20 (1st Cir. 2018) (citing *A Corp. v. All Am. Plumbing, Inc*., 812 F.3d 54, 59 (1st Cir. 2016)). Plaintiffs argue they have satisfied this standard with regard to BSSA because they alleged that (1) BSSA acted in concert with the other defendants by concocting a fraudulent scheme executed in Puerto Rico; (2) BSSA's wholly owned subsidiaries are located and do business in Puerto Rico and carried out the alleged scheme; and (3) defendants acted as alter egos and discovery

will bear out the degree to which BSSA participated in the fraudulent scheme. *See* Dkt. 52 at 51–54. These allegations fall short.

First, I do not credit plaintiffs' various assertions that BSSA acted in concert with defendants and is a joint tortfeasor in the alleged scheme, as these are entirely conclusory. Second, although plaintiffs aver that BSSA's wholly owned subsidiary is Bancorp and Bancorp's wholly owned subsidiary is SSLLC, which allegedly solicited the PRMB sales, these facts are insufficient to merit personal jurisdiction over BSSA. "A parent company may not be subject to the jurisdiction of a court merely because its wholly owned subsidiary resides in the forum." *Alvarado-Morales v. Digital Equip. Corp.*, 843 F.2d 613, 616 (1st Cir. 1988); *see also Barrett*, 239 F.3d at 27 (citing cases). Finally, the complaint's general averment that defendants were alter egos of one another and that discovery will reveal the extent to which BSSA participated in the alleged scheme is not enough to survive a 12(b)(2) motion. "[A] diligent plaintiff who sues an out-of-state corporation and who makes out a colorable case for the existence of in personam jurisdiction may well be entitled to a modicum of jurisdictional discovery if the corporation interposes a jurisdictional defense." *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 625–26 (1st Cir. 2001) (quoting *Sunview Condominium Ass'n v. Flexel Int'l, Ltd.*, 116 F.3d 962, 964 (1st Cir. 1997)). "However, 'that entitlement is not absolute.'" *Id.* (quoting *Sunview*, 116 F.3d at 964). "A plaintiff must be diligent in preserving his or her rights." *Id.* Here, plaintiffs have not made a colorable case for the existence of in personam jurisdiction, instead relying on conclusory allegations that BSSA "took part, cooperated and acted in concert" with other defendants "in causing the misconduct alleged in the complaint." Dkt. 52 at 54. Nor have they been diligent in preserving any right to jurisdictional discovery, as they have replied to defendants' motion to dismiss for lack of personal jurisdiction without requesting discovery on the issue of personal jurisdiction.

For these reasons, I recommend granting defendant's motion to dismiss the cause against BSSA for want of personal jurisdiction.

**II. Failure to State a Securities Fraud Claim**

Defendants move to dismiss plaintiffs' federal claims under Rule 12(b)(6) for failure to state a claim.

In order to survive a Rule 12(b)(6) motion, a complaint must allege "a plausible entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007). A court will "accept well-pled factual allegations in the complaint as true and make all reasonable inferences in the plaintiff's favor." *Miss. Pub. Emps.' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 (1st Cir. 2008). While a complaint need not contain detailed factual allegations in order to withstand dismissal, a plaintiff's "obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citation omitted). The court need not accept as true legal conclusions or "'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557) (internal alteration omitted); *Maldonado v. Fontanes*, 568 F.3d 263, 267 (1st Cir. 2009). The complaint must allege enough factual content to nudge a claim across the line from conceivable to plausible. *Iqbal*, 556 U.S. at 680. The court's assessment of the pleadings is context-specific, requiring the court "to draw on its judicial experience and common sense." *Id.* at 679. The plaintiff must show more than the "sheer possibility that a defendant has acted unlawfully." *Id.* at 678. "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotations and alterations omitted).

Plaintiffs agree that their Section 17(a) claim should be dismissed, and I therefore recommend dismissal of that claim. Plaintiffs maintain, however, that their complaint successfully alleges a cause of action under Section 10(b) and Rule 10b-5 of the 1934 Securities Exchange Act. Section 10(b) provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or of any facility of any national securities exchange . . .
>
> (b) To use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device . . . in contravention of such rules and regulations as the Commission may prescribe . . . .

15 U.S.C. § 78j. In turn, Rule 10b–5 prohibits the use of any instrument of interstate commerce to make "any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5(b). Rule 10b–5 "is coextensive with the coverage of Section 10(b)." *S.E.C. v. Zandford*, 535 U.S. 813, 816 (2002). To state a claim for securities fraud under Section 10(b) and Rule 10b-5, plaintiffs must allege: 1) a material misrepresentation or omission; 2) scienter; 3) a connection with the purchase or sale of a security; 4) reliance; 5) economic loss; and 6) loss causation. *Brennan v. Zafgen, Inc*., 853 F.3d 606, 613 (1st Cir. 2017). The appropriate measure of damages is usually the difference in the price paid and the value received. *Lawton v. Nyman*, 327 F.3d 30, 42 (1st Cir. 2003).

The PSLRA, 15 U.S.C. § 78u–4, governs complaints alleging securities fraud. Enacted to curb perceived abuses in private securities litigation, PSLRA imposes a heightened pleading standard that requires complaints alleging securities fraud to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1); *see also Aldridge v. A.T. Cross Corp*., 284 F.3d 72, 78 (1st Cir. 2002). Plaintiffs "must also meet the Rule 9(b) standard for pleading fraud with particularity." *ACA Fin. Guar. Corp. v. Advest, Inc*., 512 F.3d 46, 58 (1st Cir. 2008). It has long been established that the First Circuit is "especially strict in demanding adherence to Rule 9(b) in the securities context." *Gross v. Summa Four, Inc*., 93 F.3d 987, 991 (1st Cir. 1996).[1] "[T]he plaintiff must not only allege the time, place, and

---

[1] *Gross* has been partially superseded on other grounds by the PSLRA. *Greebel v. FTP Software, Inc*., 194 F.3d 185, 191 (1st Cir. 1999).

content of the alleged misrepresentations with specificity, but also the 'factual allegations that would support a reasonable inference that adverse circumstances existed at the time of the offering, and were known and deliberately or recklessly disregarded by defendants.'" *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193–94 (1st Cir. 1999) (quoting *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir. 1991)); *see also id.* at 194 (explaining that PSLRA pleading standards are consistent with the First Circuit's Rule 9(b) fraud pleading standards). Although "'the PSLRA does not require plaintiffs to plead evidence,' . . . a significant amount of 'meat' is needed on the 'bones' of the complaint." *Hill v. Gozani*, 638 F.3d 40, 56 (1st Cir. 2011) (quoting *Advest*, 512 F.3d at 63).

In the instant case, plaintiffs challenge allegedly material omissions rather than affirmative misrepresentations. Generally, an omission is actionable under Rule 10b-5 only when there is an affirmative duty to disclose. *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Chiarella v. United States*, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."); *S.E.C. v. Tambone*, 597 F.3d 436, 448 (1st Cir. 2010). Section 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose all material information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44–45 (2011). "Disclosure is required under these provisions only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* (citing 17 C.F.R. § 240.10b–5(b)). Thus, "[e]ven with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." *Mississippi Pub. Employees' Ret. Sys. v. Bos. Sci. Corp.*, 649 F.3d 5, 21 (1st Cir. 2011) (quoting *Matrixx*, 563 U.S. at 45).

Here, plaintiffs have not described specific statements by defendants that they wish to challenge. The complaint alleges that SSLLC affirmatively contacted plaintiffs and recommended that they purchase PRMB securities. Presumably, SSLLC's representatives

must have made some statement in order to solicit plaintiffs' purchases, for instance, by saying, "I recommend that you purchase these securities." But the complaint provides no details whatsoever regarding the contents of those communications other than to allege that the statements, whatever they were, failed to include certain details.

This is no minor oversight. Imagine a scenario where SSLLC's financial advisors called plaintiffs and said, "I recommend you purchase Puerto Rico municipal bonds. I know you are looking for a safe investment, and I think this is a good fit for you." If this were the case, at least some of the alleged omissions might be actionable. The statement made, having implied that PRMBs were a safe investment, could arguably be misleading unless SSLLC also disclosed various details regarding Puerto Rico's economy and the risks of owning PRMB securities. But if an SSLLC financial advisor called plaintiffs and said, "I recommend you purchase Puerto Rico municipal bonds, though I can make no representations regarding the risks involved," there would be no obvious duty under Section 10(b) and Rule 10b–5(b) to disclose the alleged omissions. Without any details regarding defendants' statements, this court cannot determine whether disclosure was necessary in order to make the "statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44–45 (citing 17 C.F.R. § 240.10b–5(b)). Nor can the court say that plaintiffs have met the heightened pleading requirements of the PSLRA, which require plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1)(B).

Plaintiffs argue that various other sources of law established a fiduciary relationship between plaintiffs and defendants that required defendants to make certain disclosures in any event. *See* Dkt. 52 at 23–33. But even if the court assumes defendants were under some duty to disclose, the complaint would fail for inadequate pleading of scienter.

Plaintiffs alleging securities fraud must show that defendants acted with scienter, which is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc.*

*v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94 & n.12 (1976)). "A plaintiff must 'show either that the defendants consciously intended to defraud, or that they acted with a high degree of recklessness.'" *Kader v. Sarepta Therapeutics, Inc.*, 887 F.3d 48, 57 (1st Cir. 2018) (quoting *Aldridge*, 284 F.3d at 82) (internal citation omitted). Recklessness involves "a highly unreasonable omission" constituting "not merely simple, or even inexcusable, negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Brennan*, 853 F.3d at 613 (quoting *Greebel*, 194 F.3d at 198).

The PSLRA requires that plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Kader*, 887 F.3d at 57 (quoting 15 U.S.C. § 78u–4(b)(2)) (emphasis in *Kader*). This provision "demand[s] a recitation of facts supporting a 'highly likely' inference that the defendant acted with" scienter. *Ezra Charitable Tr. v. Tyco Int'l, Ltd.*, 466 F.3d 1, 6 (1st Cir. 2006) (quoting *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 195 (1st Cir. 2005)). And it "alters the usual contours of a Rule 12(b)(6) ruling because, while a court continues to give all reasonable inferences to plaintiffs, those inferences supporting scienter must be strong ones." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 28 (1st Cir. 2002) (citing 15 U.S.C. § 78u–4(b)(2) and *Greebel*, 194 F.3d at 196–97, 201). The complaint must be such that "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The First Circuit has determined that this standard is met where a complaint "contains clear allegations of admissions, internal records or witnessed discussions suggesting that at the time they made the statements claimed to be misleading, the defendant[s] were aware that they were withholding vital information or at least were warned by others that this was so." *Brennan*, 853 F.3d at 614 (alteration in original) (quoting *In re Bos. Sci. Corp. Sec. Litig.*,

686 F.3d 21, 31 (1st Cir. 2012)); *see also Greebel*, 194 F.3d 185, 196 (listing examples of evidence relevant to scienter). The analysis, however, is "fact-specific" and "proceeds case by case." *Ezra*, 466 F.3d at 6 (quoting *Cabletron*, 311 F.3d at 38).

In conducting this inquiry, the court must look at the "complaint as a whole," and "weigh not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008) (internal quotations omitted). "When there are equally strong inferences for and against scienter, the draw is awarded to the plaintiff." *Fire & Police Pension Ass'n of Colorado v. Abiomed, Inc.*, 778 F.3d 228, 241 (1st Cir. 2015) (quoting *City of Dearborn Heights Act 345 Pol. & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 757 (1st Cir. 2011)).

The thrust of plaintiffs' scienter allegations are as follows. SSLLC held in its inventory PRMB securities. Defendants generally profited from the sale and management of PRMB securities. As Puerto Rico continued experiencing a recession, the government of Puerto Rico was issuing new debt to pay off old debt. The financial services industry issued a series of warnings regarding the possibility of a default by the government of Puerto Rico. Given this situation, defendants knew the value of PRMB securities would degrade. SSLLC began selling off its PRMB inventory but continued to sell PRMB securities to plaintiffs. This was true because defendants had conspired to continue selling PRMB securities without disclosing all the relevant risks and without disclosing the fact that SSLLC believed that PRMBs were too risky for its own inventory. By plotting and executing this scheme, defendants would reap financial benefits. Taken together, these allegations permit a plausible, but not strong, inference of scienter.

The facts as alleged give rise to a strong inference that SSLLC knew PRMBs were risky. Puerto Rico was experiencing a serious economic recession, and the Puerto Rico government had established a pattern of issuing new debt to pay old debt. Moody's had twice downgraded Puerto Rico's GO credit rating and various others in the financial

services industry had warned municipal investors of a possible default. Because SSLLC was the dominant market trader of PRMBs, it is fair to conclude that its agents would have been aware of these warnings. That SSLLC knew PRMBs were risky, however, does not mean it knew a crash in the PRMB securities market was inevitable. Indeed, while some of the warnings regarding PRMB securities were dire, others were more cautious. *Compare* Am. Compl. ¶ 72 (July 2012 report referring to Puerto Rico debt growth as "unsustainable") *with id.* (February 2013 report referring to Puerto Rico's "significant debt burden"). And plaintiffs themselves admit that public information regarding the creditworthiness of PRMB securities may have been somewhat conflicting. Dkt. 52 at 14. To conclude that SSLLC or the other defendants knew a market crash was inevitable would be to permit plaintiffs to plead "fraud by hindsight." *Ezra*, 466 F.3d at 6. In other words, plaintiffs essentially make "general allegations 'that defendants knew earlier what later turned out badly.'" *Id.* (quoting *Gross*, 93 F.3d at 991). But this approach "is not sufficient" to meet the PSLRA's rigorous scienter standard. *Id.*

The facts also support the inference that the degree of risk involved in owning PRMBs was inconsistent with SSLLC's own investment strategy. After Moody's twice downgraded Puerto Rico's GO rating and after various other warnings, SSLLC adopted a "Risk Management Strategy" that meant it would close its trading desk to PRMBs and sell off its PRMB inventory. That PRMBs were too risky for SSLLC, however, does not mean that they would be too risky for plaintiffs.

Indeed, plaintiffs have failed to offer any details regarding their own interests as investors or regarding defendants' knowledge of those interests. The complaint does not explain whether plaintiffs were conservative investors, moderate-risk investors, or speculative investors. Plaintiffs make no mention of whether they were attracted to PRMBs because of their potential tax advantages or if they simply sought a safe investment, regardless of the tax implications. The closest plaintiffs come to expressing why the alleged omissions would have mattered to their investment strategy is by asserting that, had

defendants made certain disclosures at the point of sale, they would not have purchased PRMB securities. But they do not state that *defendants knew* this was the case. And although plaintiffs allege that defendants intentionally passed their own risk of owning PRMBs on to plaintiffs without plaintiffs' knowledge, that fact could only evince scienter if defendants also knew plaintiffs sought to avoid that risk. *See In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 751 (1st Cir. 2016) (explaining that "[a] statement cannot be intentionally misleading if the defendant did not have sufficient information at the relevant time to form an evaluation that there was a need to disclose certain information and to form an intent not to disclose it") (quoting *N.J. Carpenters Pension*, 537 F.3d at 45). But this the complaint has failed to allege.

Instead of alleging specific facts relevant to defendants' scienter, plaintiffs rely on conclusory assertions. *See, e.g.*, Am. Compl. ¶ 111 ("The Santander Defendants had actual knowledge of the materiality of the facts that they omitted and concealed from the Plaintiffs and putative Class members."). But the court does not credit mere conclusory allegations on a motion to dismiss, particularly where Rule 9(b) and the PSLRA apply. Without facts showing that defendants knew plaintiffs were conservative or even moderate-risk investors, the court cannot conclude that defendants knowingly or even recklessly engaged in any deception via the alleged omissions. If SSLLC's risk tolerance was low but plaintiffs were investors with a high tolerance for risk and a keen interest in the potential tax advantages of PRMBs, then SSLLC's strategy with regard to its own PRMB inventory would be immaterial to plaintiffs. Defendants could not have intended to defraud plaintiffs by omitting information they believed irrelevant to plaintiffs. *See Brennan*, 853 F.3d at 614 (quoting *Dearborn Heights*, 632 F.3d at 758) ("'The key question in this case is not whether defendants had knowledge of certain undisclosed facts, but rather whether the defendants knew or should have known that their failure to disclose those facts' risked misleading investors."). At most, the complaint permits a conclusion that defendants were negligent by failing to recognize the importance of the alleged omissions to any "reasonable

investor." But negligence is not enough for scienter. *Auto. Indus. Pension Tr. Fund v. Textron Inc*., 682 F.3d 34, 39 (1st Cir. 2012) (citing *Greebel*, 194 F.3d at 207).

Ultimately, plaintiffs' scienter allegations rest on defendants' economic incentive to sell PRMB securities coupled with conclusory assertions that defendants worked in concert to concoct a fraudulent scheme. *See, e.g*., Am. Compl. ¶ 113 ("The Santander Defendants acted in the Scheme with conscious knowledge of the fraud and deception, scienter and 'dolo'. . . and did so with the intent to deceive [plaintiffs] to purchase the PR securities."). But "[i]t is ordinarily not sufficient to conclusorily allege 'an overarching fraudulent scheme or corrupt environment.'" *Ezra*, 466 F.3d at 10 (quoting *In re Credit Suisse First Boston Corp*., 431 F.3d 36, 49 (1st Cir. 2005)). And "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are [not] sufficient." *Greebel*, 194 F.3d at 197 (quoting *In re Advanta Corp. Sec. Litig*., 180 F.3d 525, 534–35 (3d Cir. 1999)).[2]

In other words, the complaint fails to plead with particularly the sort of facts that would permit a strong inference of scienter. Plaintiffs have not offered, for instance,

---

[2] Here I note that the complaint is particularly deficient with regard to specifically pleading the scienter of the non-SSLLC defendants. A securities fraud plaintiff must demonstrate scienter as to each defendant. *See, e.g., Blue v. Doral Fin. Corp*., 123 F. Supp. 3d 236, 270–71 (D.P.R. 2015). Although the complaint includes a few specific facts regarding SSLLC—for instance, alleging that SSLLC adopted a risk management strategy to rid itself of PRMBs—its allegations regarding the non-SSLLC defendants are blanket assertions devoid of specific facts. *See, e.g*., Am. Compl. ¶ 45 ("[T]he Santander Defendants acted in concert and are joint tortfeasors in the creation and execution of the Scheme to Defraud."). This approach falls short of the rigorous pleading requirements of 9(b) and the PSLRA. *See Blue*, 123 F. Supp. 3d at 271 (finding a securities fraud claim inadequate where the complaint grouped together defendants "generally without specifically referring to each one of them" and "fail[ed] to specify the what, where, and when of the alleged fraud."). Defendants correctly argue that the complaint lacks particularized facts regarding any non-SSLLC defendants and that dismissal of the action against the non-SSLLC defendants is independently merited even if the complaint stated a cause of action against SSLLC. This is so even though plaintiffs contend that information regarding the degree to which defendants acted on one another's behalf is within defendants' exclusive control. *See Gross*, 93 F.3d at 991–92 ("[T]he heightened pleading requirement of Rule 9(b) applies even when the fraud relates to matters peculiarly within the defendant's knowledge."); *see also Aldridge*, 284 F.3d at 78 (quoting *Greebel*, 194 F.3d at 193–94) (explaining that plaintiffs who bring securities fraud claims on information and belief must "set forth the source of the information and the reasons for the belief").

internal records, witnessed discussions, or other clear admissions demonstrating that, at the time of the alleged omissions, "the defendant[s] were aware that they were withholding vital information or at least were warned by others that this was so." *Brennan*, 853 F.3d at 614 (alteration in original) (quoting *In re Bos.*, 686 F.3d at 31); *see also Auto. Indus.*, 682 F.3d at 39 (affirming dismissal where "warnings by subordinates or expressions of concern by executives" were "notably absent"). And although the sort of facts that can demonstrate scienter vary in each case, *Greebel*, 194 F.3d at 196, those offered here fall short.

Based on the allegations before the court, an inference of fraudulent intent is at most "plausible," and not "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Accordingly, plaintiffs' Section 10(b) and Rule 10b–5 claim should be dismissed.[3]

**III. Supplemental Jurisdiction Over Puerto Rico Law Claims**

Because plaintiffs' federal claims fail as a matter of law, the court may consider declining supplemental jurisdiction over plaintiffs' remaining Puerto Rico law claims under 28 U.S.C. § 1367(c). "Courts must exercise informed discretion when deciding whether to assert supplemental jurisdiction." *Santana-Vargas v. Banco Santander Puerto Rico*, 948 F.3d 57, 61 (1st Cir. 2020) (quoting *Redondo Const. Corp. v. Izquierdo*, 662 F.3d 42, 49 (1st Cir. 2011)) (internal quotations omitted). They must consider "concerns of comity, judicial economy, convenience, and fairness." *Id.* These factors must be weighed in a "pragmatic and case-specific" way. *Redondo*, 662 F.3d at 49 (citation omitted). Pretrial dismissal of federal-question claims usually counsels dismissal of state-law claims without prejudice. *Id.*

Pragmatic concerns here favor declining jurisdiction and dismissing the Puerto Rico claims. All remaining causes of action arise under Puerto Rico law. And although this

[3] Because I find that plaintiffs have failed to state a claim under Section 10(b) and Rule 10b–5, I do not reach defendants' arguments as to whether that claim is time-barred or whether plaintiffs may challenge the sale of securities they did not personally purchase.

action was filed almost three years ago, proceedings have not advanced far beyond the pleadings stage. Declining to assert supplemental jurisdiction over the remaining Puerto Rico law claims would not generate excessive burdens on the parties nor significantly implicate concerns of judicial economy, convenience, and fairness. Accordingly, I recommend declining supplemental jurisdiction over plaintiffs' Puerto Rico law claims.

## CONCLUSION

For the foregoing reasons, defendants' motions to dismiss should be **GRANTED**.

This report and recommendation is filed pursuant to 28 U.S.C. 636(b)(1) and Rule 72(d) of the Local Rules of this Court. Any objections to the same must be specific and must be filed with the Clerk of Court **within fourteen days** of its receipt. Failure to file timely and specific objections to the report and recommendation is a waiver of the right to appellate review. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Davet v. Maccorone*, 973 F.2d 22, 30–31 (1st Cir. 1992); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 5th day of June, 2020.

S/ Bruce J. McGiverin

BRUCE J. MCGIVERIN
United States Magistrate Judge